JESSE JONES, Appellee, v. CITY OF DYERSBURG, Appellant.—440 S.W.2d 809.

Western Section. September 18, 1967.

Certiorari Denied May 6, 1968.

356

A. D. Walker, Jr., Ewell & Ewell, Dyersburg, for appellant.

Barnett, Montgomery, McClintock & Cunningham, Jackson, Miss., Ashley, Malone, Ashley & Lawson, Dyersburg, for appellee.

CARNEY, J. The City of Dyersburg has appealed from a judgment of the Circuit Court of Dyer County, Tennessee, for $50,000 in favor of the plaintiff below, Jesse Jones, for injuries sustained on September 24, 1964. The plaintiff came in contact with an electrical transmission line carrying 7,600 volts while working on a pole about 25 feet above the ground. Plaintiff was so severely burned that both feet had to be amputated above the ankles. The case was tried without a jury.

Plaintiff Jones was employed as a second class lineman for Safeco Construction Company of Jackson, Mississippi. The City of Dyersburg buys electricity wholesale from the Tennessee Valley Authority and supplies it retail to residents of Dyersburg and the nearby area through lines owned and maintained by the City of Dyersburg. The City had entered in a contract with L. O. Brayton & Company, a Tennessee corporation with its principal place of business in Dyersburg, at a total price of $120,000, for the extension and improvement of its electrical distribution system. L. O. Brayton & Company, with the knowledge and permission of the City of Dyersburg, subcontracted the work to Safeco Construction Company. The plans, specifications and contract for the project were prepared by Allen & Hoshall, a well-known engineering firm of Memphis, Tennessee.

The principal contract between the City of Dyersburg and L. O. Brayton & Company provided that the work on the existing system should be done while the wires were "hot." From the contract we quote as follows:

"WORK ON ENERGIZED CIRCUITS:
In general all work on the existing distribution system shall be performed under energized conditions ("Hot").

In some cases, individual transformers and short primary taps may be de-energized PROVIDED that the prior approval of the Owner is obtained. Where it is permissible to de-energize a transformer or a line section, working (de-energized) periods shall conform to the following schedule: (9:00 A.M. to 11:00 A.M. and 1:30 P.M. to 4:00 P.M.). No exception to these hours shall be made and the contractor shall so lay out his work that re-energization shall take place on schedule.

All bids shall be based upon performing all work under energized condition ("Hot") as described above, including the furnishing of all necessary overtime labor. No claims made by the Contractor for extra pay to cover energized working conditions or for overtime work will be considered by the Owner."

Working on hot lines is more hazardous and takes a longer time than working on cold or de-energized lines. Contractors regularly charge more for "hot work." The primary reason for the City of Dyersburg requiring the work to be done under "hot" conditions was to cause a minimum of inconvenience to its customers from the lines being de-energized. Such "hot" contracts are customary when work is being done on existing systems.

The accident in which plaintiff was injured happened about 11:00 A.M. All of the lines on the poles with which plaintiff was working were hot and plaintiff knew it. Safeco's superintendent, Mr. Sam Riley, testified that on one or more occasions he had requested permission from Mr. Crawford, manager of the Dyersburg Electric System, to de-energize some of the lines and on each occasion had been refused. On the day in question no request had been made by Mr. Riley to de-energize

any of the power lines on the pole at the intersection of Pate and Phillips Streets where plaintiff was injured. Plaintiff Jones had had four years experience as a lineman but had worked on hot lines about seven months.

Safeco Construction Company was covered by workmen's compensation insurance as required by the statutes of the State of Tennessee. The plaintiff, Jones, had received or was receiving such compensation at the time of the trial.

He brought this suit against the City of Dyersburg on the theory that the City of Dyersburg, as a supplier of electricity, owed the plaintiff and all other persons a nondelegable duty to use the highest degree of care to prevent the plaintiff or any other person who might be lawfully on the defendant's premises from being injured by said electricity. He relied principally upon the authority of International Harvester Co. v. Sartain, 32 Tenn.App. 425, 222 S.W.2d 854.

Plaintiff averred that the City of Dyersburg was negligent in failing to provide a safe place for the plaintiff to work; was negligent in failing to see that the plaintiff was furnished with proper and necessary safety equipment; was negligent in failing to determine that the plaintiff was capable of performing the hazardous and inherently dangerous work required by the contract; in failing to inspect the work by Safeco; was negligent in failing to warn the plaintiff of the imminent danger inherent in the performance of the contract and was negligent in failing to provide proper overcurrent protection such as fuses and breakers which would de-energize the line when any person or object came in contact with it.

Defendant filed a plea in abatement and demurrer. Both were overruled by the Trial Judge. After hotly contested trial His Honor the Trial Judge found all issues in favor of the plaintiff and assessed his damages at $50,000.

In a written finding of fact the Trial Judge found the defendant City of Dyersburg guilty of proximate negligence as follows:

(1) Two of the three primary lines carrying 7,600 volts on the pole where plaintiff was injured could have been de-energized without interruption of service to defendant's customers at the time the plaintiff was injured; that the primary line upon which plaintiff was burned had not been used for a year or more prior to the accident and was maintained in an unsafe energized state.

(2) The secondary wires could have been de-energized at little interruption of service to residential customers.

(3) The circuit breakers could have been set to open with the first contact rather than to open after three cycles of opening and closing with a maximum flow of current.

(4) The fuses were improperly set for the safety of workers handling energized wire.

(5) Protective equipment furnished by Safeco was worn, defective and insufficient to protect the workmen handling hot wires and the city failed to inspect it.

(6) The plaintiff, Jesse Jones, had only seven months actual experience working under energized conditions and was therefore insufficiently experienced to work on hot wires either primary or secondary and the city should not have permitted him to work on the hot lines.

(7) The City of Dyersburg failed to furnish mechanical jumpers to Safeco for use by its employees.

The City of Dyersburg's assignments of error I through V assail the action of the Trial Judge in overruling the demurrer and plea in abatement. Assignment of error No. I insists that the plea in abatement should have been sustained because the City of Dyersburg was a principal contractor and the plaintiff's right to recovery was limited to an award of workmen's compensation and having collected the workmen's compensation from Safeco's insurance carrier the plaintiff was not entitled to recover anything from the City of Dyersburg. Appellant cites and relies upon Clower v. Memphis Light, Gas & Water Division, 54 Tenn.App. 716, 394 S.W.2d 718, and Adams v. Hercules Powder Co., 180 Tenn. 340, 175 S.W.2d 319, 151 A.L.R. 1352. T.C.A. Section 50-915 provides as follows:

"50-915. Liability of principal intermediate contractor or subcontractor for injuries to any employee—Remedies—Recovery.—A principal, or intermediate contractor, or subcontractor shall be liable for compensation to any employee injured while in the employ of any of his subcontractors and engaged upon the subject matter of the contract to the same extent as the immediate employer.

Any principal, or intermediate contractor, or subcontractor who shall pay compensation under the foregoing provisions may recover the amount paid, from any person who, independently of this section, would have been liable to pay compensation to the injured employee, or from any intermediate contractor.

Every claim for compensation under this section shall be in the first instance presented to and instituted against the immediate employer, but such proceedings shall not constitute a waiver of the employee's rights to recover compensation under this law from the principal or intermediate contractor, provided that the collection of full compensation from one (1) employer shall bar recovery by the employee against any others, nor shall he collect from all a total compensation in excess of the amount for which any of said contractors is liable.

This section shall apply only in cases where the injury occurred on, in, or about the premises on which the principal contractor has undertaken to execute work or which are otherwise under his control or management. (Acts 1919, ch. 123, sec. 15; Shan.Supp., sec. 3608a164; Code 1932, sec. 6866.)"

██ In our opinion neither the Clower case nor the Hercules Powder Company case is applicable to the case at bar. L. O. Brayton & Company is the principal contractor and not the City of Dyersburg. The City of Dyersburg was not liable for workmen's compensation under T.C.A. Section 50-915 and therefore, the plaintiff is not barred from filing suit for alleged negligence on the part of City of Dyersburg in addition to recovering workmen's compensation. International Harvester Co. v. Sartain, supra. Therefore, assignment of error No. I is respectfully overruled.

Assignment of error No. II insists that the plea in abatement should have been sustained because the plaintiff had no contractual relationship with the City of Dyersburg and because L. O. Brayton & Company, the

original contractor, had agreed "to indemnify the City against damages" and if the plaintiff recovered in this case the City could recover from L. O. Brayton & Company; the plaintiff could not sue L. O. Brayton & Company for damages after having accepted workmen's compensation and therefore, a suit cannot accomplish indirectly what could not be accomplished directly, citing Mahaffey v. Mahaffey, 15 Tenn.App. 570, 573.

■■ This assignment of error does not comply with Rule 11(2) of this court in that it does not cite the page or pages of the record where the contract of indemnity may be found and the assignment of error is overruled. However, we do comment that in the course of reading the record, exhibits and briefs we found the portion of the contract which provides that the contractor shall indemnify the owner against damages and injury to property caused by the contractor "and his employees through negligence, carelessness or other cause." We do not interpret this contract as agreeing to indemnify the owner, City of Dyersburg, against liability for the City's negligence and it has no application to a suit for damages by plaintiff Jesse Jones against the City of Dyersburg for alleged proximate negligence resulting in injuries to plaintiff Jones.

Assignment of error No. III makes the same insistence with reference to Safeco Construction Company and is overruled for the same reasons set out under assignment of error No. II.

Assignment of error No. V insists that the Trial Judge erroneously held that plaintiff's suit was not barred by the receipt of benefits under workmen's compensation law. This assignment of error is overruled for the reasons set out above.

██ ██ Assignment of error No. IV insists that the court erroneously overruled defendant's demurrer because the plaintiff did not allege any relationship between him and the City which imposed a duty upon the City and because the plaintiff did not allege any actionable negligence on the part of the City of Dyersburg and because the declaration disclosed on its face that the plaintiff was guilty of proximate negligence and that the plaintiff assumed the risk. While the assignment presents a very close question of law as to the sufficiency of allegations of proximate negligence on the part of the defendant City of Dyersburg, we think His Honor the Trial Judge correctly held that the City of Dyersburg was under a non-delegable duty to use the highest degree of care to prevent the plaintiff or other persons on its premises from being injured by the electrical current being transmitted over its lines and that the declaration alleged sufficient grounds of negligence, absent any testimony, to justify overruling the demurrer. Therefore, assignment of error No. IV is overruled.

██ Before we discuss the assignments of error relating to findings of the court on the evidence we think it proper to discuss the circumstances under which the plaintiff was injured. Having been tried before the court below without a jury the case comes to this court on appeal accompanied by a presumption of correctness of the judgment of the court below. T.C.A. Section 27-303.

The Safeco Construction Company had been working on the Dyersburg Electrical Distribution System for a period of several weeks prior to the accident with some fifteen to twenty men. The superintendent was Mr. Sam Wayne Riley, the next in command was his brother, Jim Riley, the assistant superintendent, and the third in

command was Mr. Eddie Arms, a journeyman lineman with seven years experience working with hot lines.

Mr. Arms drew $3.15 per hour as a first class or journeyman lineman and the plaintiff Jones drew $3.05 per hour as a second class lineman. The workmen were usually divided into crews of five men, two of whom worked on the poles and the other three worked on the ground more or less as assistants to the workmen on the poles. On the day in question the plaintiff, Jesse Jones, was working on the pole with the top lineman, Mr. Eddie Arms. Mr. Arms, of course, was in charge of the crew.

A primary line consisting of three wires ran northward along Pate Avenue to a crossarm at the top of the pole located at the northeast corner of the intersection with Phillips Street. The three primary lines dropped down approximately three feet to another crossarm and ran west on Phillips Street to a transformer some two or three poles west on Phillips Street. The current from the primary lines running north on Pate Street dropped down into the primary lines running west on Phillips Street by means of three short lines called jumpers. None of these wires were insulated and it is not customary for primary lines to be insulated. The construction contract provided for another primary line to go along the top of the pole and it was necessary to lower the two crossarms already on the pole about three feet each so as to allow clearance for the new line to go at the top of the pole.

It is customary for the contractor or subcontractor to furnish the safety equipment for the use of its employees in working on hot lines. Among these are heavily insu-

lated rubber gloves to be worn by the workmen, rubber blankets to be placed over the wires and also short pieces of insulated material which resemble short pieces of garden hose sliced on one side from end to end, called by the trade "guts" or "snakes" or "sleeves," which simply slip over the hot wires. All of these materials are designed to keep the workmen from coming in contact with the energized wires. They are all conveniently and easily used by the workmen.

It is customary for the linemen, as they go up the pole, to cover the hot wires in the area in which the work is to be done with one of the insulated materials, either the rubber blanket or the pieces of "guts" or "sleeves." As Mr. Arms, the top lineman, worked up the pole he covered all of the hot area with guts or sleeves except one of the jumpers leading from the top crossarm to the lower crossarm. The evidence is somewhat unclear as to why the third jumper was left exposed and uncovered. Both Arms and plaintiff Jones had on their heavy rubber gloves.

The plaintiff Jones gives the following account of the manner in which he was injured:

"A. Then we took and put a new crossarm down where we took the underbuild and then after we got our arms on, we lowered the wires.

Q. Lowered the wires?

A. Yes, sir.

Q. What kind of wires were they? Did they have current in them?

A. Yes, sir, 7600 volts.

Q. Tell His Honor how you lowered the wires?

A. We took ropes with a grip and slide it out on the wires and take and fasten it around the crossarm and lower it down with bells on it, down to the lower arms.

Q. How many crossarms did you lower; do you remember?

A. Well, we lowered two and put a new one on top.

Q. A new one on top?

A. Yes, sir.

Q. While you were going up the pole and while you were working on the pole tell the Court, Mr. Jones, about how far you were from these hot wires or from the nearest one?

A. The nearest one, I believe, was about twelve inches, going up.

Q. In other words, you were going up there and you were about twelve inches from it when you were traveling up and when you stopped?

A. When we stopped.

Q. Now then, what voltage do you recall that was?

A. 7600.

Q. 7600?

A. Yes.

Q. About how high were you from the ground when you were within twelve inches of that 7600 volt wire?

A. I suppose about 35 feet.

Q. At that time tell the Court just exactly what you were doing, what kind of work you were doing when you got burned?

A. I was putting a pea line, straightening it out where we could pull off the ropes that were hung on some wires.

Q. In straightening out a pea line, state whether or not it was necessary that you move this crossarm around?

A. Yes, sir, you have to move your arms around to get to where you are going to put them.

Q. State whether or not it was necessary that you move your body a certain distance?

A. Yes, you have to move your body as you move this arm.

Q. Which way were you moving, if you remember?

A. The best I can remember, I was moving this way (indicating). This is the side I fell into it with (indicating).

Q. Moving toward your left?

A. Yes.

Q. Show the Court what you were doing with your left arm.

A. I was reaching to get the pea line and I hit the jumper with my arm.

Q. What kind of a wire is the jumper?

A. That was the wire that was coming from the top wire down to the other wire.

Q. The evidence here, Mr. Jones, shows that there were three of those jumper wires?

A. Yes, sir.

Q. And that they were fairly parallel; do you agree with that?

A. Yes.

Q. You were kind of leaning over and reaching which way, now?

A. I believe it would be kind of to the northwest.

Q. What was in your hand?

A. A rope.

Q. A rope?

A. Yes.

Q. What were you trying to do with it?

A. I was trying to get it over the wires where we could pull the other ropes through.

Q. You were trying to get it over the wires?

A. Yes.

Q. Your body was about twelve inches from the hot wire at that time?

A. Yes, the best I can remember.

Q. You were manipulating your left arm?

A. Yes.

Q. Was that part of your duties?

A. Yes.

Q. State whether or not at the time you were burned, you were actually engaged in the duties and responsibilities that had been entrusted to you?

A. Yes.

Q. Were you doing what you were told to do?

A. Exactly what I was told to do.

Q. While you were reaching around with your left arm with the pea line, tell the Court exactly what happened to you?

A. Well, as I was reaching around, I got into the wire.

Q. Do you know whether or not a 7600 volt wire will arc?

A. Sometimes it will arc.

Q. Sometimes it will?

A. Yes, the best I know.

Q. You don't know how far, do you?

A. No, sir, I don't know exactly how far.

Q. Now then, when you were up on the pole, were you straight when you were about twelve inches from it?

A. Yes, the best I can remember.

Q. Then, when you leaned over, would that put you nearer the wire?

A. Yes, I believe it would.

Q. About how much nearer were you to it when you leaned over?

A. Well, sir, I couldn't say exactly. It was pretty close, I suppose.

Q. Pretty close?

A. Yes, sir.

Q. Do you know whether it was a primary wire that struck you and burned you?

A. I just called it a hot wire, the main hot wire.

Q. You call it the main hot wire?

A. Yes."

The only other witness to the accident was the crew leader, Mr. Eddie Arms, who was offered as a witness for the defendant. His account of the accident is as follows:

"Q. Were you working in Dyersburg for Safeco on the electrical distribution system on September 24, 1964, when Jesse Jones was burned?

A. Yes, sir.

Q. Referring particularly to that day, were you and Jesse working together that day?

A. Yes, sir.

Q. Were you on the same pole when he was burned?

A. Yes, sir.

Q. About what time did you go to work that day if you recall, Mr. Arms?

A. About seven o'clock.

Q. What pole were you working on in reference to the pole he was burned on?

A. We were working on the pole he was burned on.

Q. You worked on it the entire morning, did you?

A. Yes.

Q. At that time of morning, did you have safety equipment such as gloves and guts?

A. Yes, we had some guts.

Q. Where were they?

A. Where we covered up and went up the pole.

Q. Where were they before you went up the pole?

A. In the truck.

Q. Did you have enough guts that you needed that day?

A. I imagine we had enough for that particular pole, yes.

Q. When you went up the pole, did you cover up the hot wires?

A. We covered up some of them. The jumper wasn't covered up.

Q. All of them were covered up but the jumper?

A. I would say they were.

Q. Do you recall whether it was or was not covered up?

A. It wasn't covered up, I don't think.

Q. I see.

A. I know it wasn't covered up when he touched it.

Q. Yes, but when you went up the pole, do you remember whether or not it was covered?

A. No, sir, I don't.

Q. You don't know?

A. No, sir.

Q. You do think you know the others were covered up?

A. Yes.

Q. But you had sufficient guts to cover the jumpers up?

A. We had some guts, yes, sir.

Q. You had enough to cover the jumpers up too, did you?

A. Yes.

Q. Now, on that pole, Eddie, as I understand the testimony, you had to move the jumpers up to—

A. (Interposing) No, sir, we didn't move them; we just had to change them out.

Q. Change them out?

A. Put longer jumpers on.

Q. You changed the jumpers?

A. Yes, we took the short jumpers off and put on some long jumpers where we could lower the arm.

Q. How many jumpers were involved please?

A. I think there were three of them.

Q. Three short jumpers first, I assume, on the pole when you went up there?

A. Yes.

Q. And you changed the process and finally had three longer jumpers?

A. Yes.

Q. Were the three longer jumpers insulated?

A. No.

Q. Were any of the wires involved on that job generally insulated, Eddie?

A. No, sir.

Q. You were working them hot?

A. Yes, sir.

Q. Now, when you started down the pole—about what time did this accident happen, Mr. Arms?

A. I figure it happened somewhere around 11 or 11:30. I don't know exactly the time.

Q. Your best judgment is about 11:30?

A. Yes.

Q. In the morning?

A. Yes.

Q. When you started down the pole, which side of the pole were you on?

A. I was on the back side of the pole.

Q. What side is that; do you know directions there?

A. No, sir, I don't know the directions.

Q. Do you know where Phillips Street is?

A. Yes.

Q. Were you facing Phillips Street when you started down the pole?

A. Phillips Street came this way (indicating). I was in this quarter right here at Phillips and Pate.

Q. You were, I assume, on the northwest part of the pole then?

A. I don't know the direction.

Q. Where was Jesse when you started down?

A. Jesse was on this side of the pole (indicating).

Q. On the opposite side?

A. Yes.

Q. Who started removing the guts?

A. I don't know who started. Both of us, I imagine.

Q. Do you normally remove the guts on the side of the pole on which you are?

A. You uncover as you come down.

Q. That is what I mean.

A. Yes.

Q. Were both of you uncovering?

A. I don't know.

Q. Your best recollection? Could you remove the guts on his side of the pole?

A. The guts on his side of the pole he removed. If they were on my side, I did.

Q. Who removed the guts on the top high power line?

A. I assume he did.

Q. What did he do with the guts when he removed them?

A. We let them down when we take them off.

Q. You could put them on another wire, couldn't you?

A. You could put them anywhere you wanted to.

Q. After you took them off the top wires, you could put them on the jumper, couldn't you?

A. Yes, sir.

Q. Did you?

A. No, sir.

Q. Tell what happened when you started down the pole, please.

A. Well, when we started down the pole Jesse was coming down and there was a pea line about four feet long. I threw the pea line down and it got hung and I told Jesse to knock that pea line off and Jesse reached over to knock it off and that is the last thing—he got his back into the jumper or something. It looked to me like he jumped, something made him jump.

Q. Was Jesse a ticklish or jumpy sort of man?

A. Jesse was goosy, yes.

Q. What do you mean by 'goosy'?

A. He would jump.

Q. Could you tell when he touched the jumper?

A. Could you tell when he touched it?

Q. Yes, could you observe anything?

A. I saw a flash.

Q. Could you tell the electricity was going through his body?

A. Yes.

Q. How long did that last in your best opinion?

A. I figure he stayed in it from one to three seconds; that is just an estimate.

Q. I know it is your best judgment; what did you do please?

A. After I felt the line kick out, I went down and took a pair of pliers, I didn't try to pull Jesse out when he was burning because I knew I couldn't get him. I took my pliers and tried to burn the wire down and it burned my pliers up and it didn't kick out, and I asked Tommy Riley if he would kick it out. They kicked it out, it wouldn't kick out for me.

Q. They went to a pole and kicked it out?

A. To the first pole down Pate Street.

Q. Where is the secondary located in reference to where you were?

A. It was located up Phillips.

Q. I mean on the pole.

A. It was down below the phase.

Q. Down below where you were?

A. Yes.

Q. Did you get Jesse down the pole?

A. Yes, I pulled Jesse down the pole.

Q. Then he was taken to the hospital, I assume?

A. Yes.

Q. Now, Eddie, from your experience with Jesse and observing his work, was he a careful, safe worker or not?

A. Well, I thought he was. I didn't mind working with him.

Q. You have testified, as I understand it, that there were additional guts in the truck when this happened?

MR. ASHLEY: If your Honor please, we object to the form of that question. That has not been the testimony.

Q. Is that true or not?

MR. BARNETT: We object to that.

THE COURT: I think it would be objectionable but go ahead.

Q. Were they or not, Mr. Arms?

A. I imagine there was some guts in the truck.

MR. BARNETT: We object to his imagining it.

A. Yes, there was other guts in the truck.

Q. Did you all work with rubber gloves?

A. Yes, sir.

Q. Was your safety equipment satisfactory safety equipment?

A. What do you mean?

Q. The equipment you used on this job?

A. Yes.

MR. EWELL: That is all."

Mr. Sam Wayne Riley, superintendent of Safeco testified as a witness for the plaintiff that Safeco had plenty of safety equipment for the job but that on the day before the accident some four or five additional employees were sent to him by the management of the company; that he took some of the safety equipment which normally

would have been used by Eddie Arms and his crew and gave it to the new crew; and that for this reason the safety equipment for the Arms crew was insufficient on the day in question. However, he admitted that he gave the City of Dyersburg no notice that he had taken some of the safety equipment from the Arms crew. He stated that he had instructed all of his employees never to work on the hot lines without proper safety equipment and that in his opinion Eddie Arms was a top lineman fully capable of doing the work for which he was employed and the work in which he was engaged on the morning of the accident.

Mr. Riley was not present at the time the accident occurred. He testified that on some four or five occasions prior to the day of the accident he had asked for permission to de-energize primary lines at various places throughout the city and had been refused permission so to do by the City of Dyersburg. However, he had not asked for permission to de-energize the primary lines being worked on by Arms and Jones on the day in question.

Mr. Robert Briggs, age 49, an electrical engineer from Jackson, Mississippi, now engaged in private practice, testified as an expert witness for the plaintiff. He was graduated from Mississippi State University in 1937 with a B.S. degree in electrical engineering and in addition had had practical experience as a lineman working up to the status of journeyman lineman. He described a journeyman lineman as one who is proficient in the handling of hot lines and capable of working on poles without direct supervision and having the ability to carry out general instructions. The crew chief, Eddie Arms, was a

journeyman lineman. From Mr. Briggs' testimony we take the following quotation:

"Q. Mr. Briggs, the construction of new lines or circuits in and about energized lines, how would you classify that activity?

A. We would classify that as highly dangerous, more dangerous than some of the other types of work.

Q. Now, Mr. Briggs, what would be the general custom and practice within the industry with respect to safety measures and precautions to be taken in erecting a new transmission or distribution lines above, near or adjacent to energized lines?

A. Well, of course, this is done where it is highly desirable to continue the existing lines in working order, those that are actually serving customers and quite often it is found that it is desirable to do this work on what we call 'energized' or 'hot lines,' and of course this is the object of the utilities company to save the customers inconvenience and collect revenue. If you can avoid that, they do, but in many cases we feel that it is justified in order to complete the work by proper practice.

Q. Then, as I understand what you have said, the only reason for working hot line contracts and hot line jobs is to avoid interruption of service to customers?

A. That's right; that is of course the objective of the utilities company to serve the customers and people of course prefer to have their electricity on twenty-four hours a day.

Q. What would be the safest method to follow?

A. The safest method would be to de-energize the lines and avoid the hazard.

Q. Now, with respect to working a pole, the construction of transmission or distribution lines on top of a pole and working through energized lines to reach that point, what would be the normal safety practice that is customary within the trade for doing that work?

MR. EWELL: We don't think that is competent in reference to the City of Dyersburg. I want to renew that objection.

THE COURT: It is not offered for the City of Dyersburg but as proof of what would be the safe practice if he knows.

MR. EWELL: The City was not engaged in that.

THE COURT: He is only offering this as to what would be the safety practice, the way I understand it, which is competent.

MR. EWELL: Note an exception.

Q. Go ahead.

A. If a decision has been made and the facts have been weighed to work that particular pole with energized lines, then the traditional method would be by covering up the energized lines with insulators, hooks, blankets and hoses, which are some of the things used for this purpose. In recent years, another technique has come into use which is the basket. Even then we generally use rubber hoses and so forth. You still cover them up with insulated material because you don't want the lines to touch of course. This is the traditional and most common method to use.

Q. With respect to the qualifications of personnel working under such conditions, what is the general and accepted customary practice in that regard?

MR. EWELL: We would like to note an objection.

THE COURT: Overruled.

MR. EWELL: Note an exception.

Q. Go ahead.

A. And of course the training of people to do this hazardous work is mostly on-the-job training. There are safety programs and instructions that are used, but most of this experience is gained by on-the-job training. It is considered normal to have a four year training program. This may be increased or in some communities decreased slightly but the normal is four years and in addition to that, examinations of the individual to test his knowledge of the work and experience are given to see who of those men are trained and generally this is before a Board of Examiners to determine the qualifications for the various levels of work.

Q. In the hiring of men to do work under those conditions, what is the usual and customary practice with respect to determining their qualifications?

MR. EWELL: We object to that.

THE COURT: Overruled.

MR. EWELL: Note an exception.

Q. Go ahead and answer, sir.

A. Most supervisors in this type work will talk to a man about his background and experience, work habits and know-how in the beginning of his employment. Of course, a man's rating is a part of his credentials and these are accepted as his qualifications unless the supervisor has reason to question them.

Q. Mr. Briggs, with respect to the de-energization of lines in a hot line contract, what is the general, customary and accepted practice within the trade as to that?

A. As to how you de-energize them?

Q. No, as to whether or not—

A. (Interposing) To de-energize them?

Q. Yes.

A. This is the decision of the person or City or whatever it might be, that owns the system. After all, it does interfere with his business and it is customary that the owner have the prerogative of determining when a line shall be de-energized and under what conditions. Certain times of the day are preferable to others. The owner of a utility likes to avoid killing a line when possible. That is the owner's prerogative, and it is generally recognized that he should make that decision. It is an administrative decision for the owner of the utility or company.

Q. Mr. Briggs, with respect to the relationships between the contractor and his employee who may be doing a particular job and the owner of a job, what is the general and customary and accepted practice regarding such relationships?

MR. EWELL: We object to that.

THE COURT: I don't know exactly what the nature of that is. I believe I will overrule it for the present.

MR. EWELL: Note an exception.

Q. Let me rephrase it. Strike that question. Mr. Briggs, the proof shows that at the time the plaintiff, Jesse Jones was injured, he was employed by the Safeco Construction

Company, constructing a new line within the City of Dyersburg under hot line conditions. The City of Dyersburg, it has been shown, was the owner; what would be or would have been the customary practice within the trade concerning the coordination of work between the owner and contractor?

MR. EWELL: We object to that. It would depend on the contract and what the parties agreed upon.

THE COURT: Overruled.

MR. EWELL: Note an exception.

Q. Go ahead and answer.

A. The customary practice is that the work of course is being done for the owner and the owner's wishes must be carried out in every respect. In doing this, the owner generally assigns a person or liaison officer to work with the contractor, between the two, and the owner is informed of the progress of the work and requirements of the job and I believe this would include the question of de-energization of the lines. If it appears that the de-energization of the lines is desirable and can be done with as little practicable interference with the customers as possible and if it is agreeable with the owner or his designated representatives, then it may be done. There are situations where lines may be de-energized and this is controlled by the owner, the discontinuation of the power temporarily and the re-connection of the lines.

Q. Mr. Briggs, where there are hot line contracts in effect, what is customary within the industry and within the trade to de-energize lines at certain times?

A. At certain times it can be done, yes. A hot line contract does of course contemplate that under certain conditions they must be worked hot and in that case the contractor is obligated to have personnel and equipment capable of doing the work under those conditions.

Q. Mr. Briggs, I have here a copy of the contract between the City of Dyersburg and the L. O. Brayton Engineering Company, and I call your attention—which incidentally has been filed in connection with the discovery deposition of Mr. Crawford; I call your attention to Section SC-2 of this contract, and ask you to examine those provisions and you might read it, pertaining to de-energization of the lines as requested by the contractor.

(Whereupon the contract referred to was passed to the witness.)

A. I am reading now under paragraph, 'Work on Energized Circuits.

In general, all work on the existing distribution system shall be performed under energized conditions (hot).

In some cases, individual transformers and short primary taps may be de-energized provided that the prior approval of the owner is obtained. Where it is permissible to de-energize a transformer or a line section, working (de-energized) periods shall conform to the following schedule: (9 A.M. to 11:00 A.M., and 1:30 P.M. to 4:00 P.M.) No exception to these hours shall be made and the contractor shall so lay out his work that de-energization shall take place on schedule.

All bids shall be based upon performing all work under energized condition (hot) as described above,

including the furnishing of all necessary overtime labor. No claims made by the contractor for extra pay to cover energized working conditions or for overtime work will be considered by the owner.

Continuity of service: The contractor shall arrange all work in such a manner as to cause the minimum possible interruptions in electric service. Under no circumstances shall electric service be interrupted at any time without prior approval of the owner. After an interruption is made, the contractor shall do all necessary work and restore service as quickly as possible.

Methods of performing work: The owner will perform all necessary switching except in cases where the contractor has made prior arrangements with the owner for the contractor's personnel to do the necessary work. In no case shall the contractor de-energize a transformer or line section without first receiving permission of the owner. The contractor shall at all times keep the owner informed as to the area and type of work being performed, even though the work does not require de-energizing the line or transformers. Clearances and arrangements for de-energization shall conform with all applicable safety rules and regulations.

All work on de-energized lines shall be done under applicable safety rules and precautions. The contractor shall furnish sufficient and adequate hot line tools and equipment for the work to be performed in a safe manner.' "

Mr. Briggs also testified that since the energy from two of the primary lines running west on Phillips Street

was not being used or serving customers the safer practice would have been for these two lines to have been de-energized while the work was being done on the pole. The trial Judge found that the failure of the city to de-energize these two primary lines as well as some secondary lines in the area constituted proximate negligence.

The wire jumper with which plaintiff Jones came in contact was a temporary jumper installed by Arms and Jones. Mechanical or prefabricated jumpers which are short, heavily insulated wires are often used by the trade for temporary jumpers but Safeco did not provide such mechanical jumpers to the plaintiff Jesse Jones and Eddie Arms on the day in question. The superintendent, Mr. Riley, brought the uninsulated wire from which the temporary jumpers were made by Arms and Jones to the scene of the accident.

The City of Dyersburg had mechanical insulated jumpers for the use of its own employees in the maintenance and repair of the electrical distribution system. Mr. Crawford, the manager of the Dyersburg system, testified that he probably would not have agreed to lend Dyersburg mechanical jumpers to Safeco if he had been requested. However, no request was made of him for the use of mechanical jumpers. The proof is abundant that in lieu of mechanical insulated jumpers it was entirely feasible and practicable for Jones and/or Arms to have put an insulated "sleeve," "snake," or "gut" on the third temporary jumper just as they had done on the other two temporary jumpers. No reasonable or satisfactory explanation was offered either by Arms or Jones as to why this third jumper was left uncovered and uninsulated while they worked on the pole.

Mr. Robinson, a member of the engineering firm of Allen and Hoshall for twenty years testified that he approved the assignment of the contract by Brayton to Safeco for the reason that Safeco was known as a reputable construction company fully capable of carrying out the terms and provisions of the contract; that he had known of the company for over ten years. He said it was the duty of Safeco to furnish the necessary safety equipment to its employees; that he observed the safety equipment being furnished by Safeco and such equipment seemed of the usual type required for such work; that the workmen for Safeco seemed to be fully qualified and that he had no reason to believe that the plaintiff Jones or any person would be exposed to danger if the work was done according to the contract and if proper safety equipment was used; and that he did not observe any instance where the work by Safeco was being done in an unsafe and improper manner.

Mr. Julius Crawford, age 44, had been manager of the Dyersburg electric system since 1957. He testified that he visited the sites of the construction work by Safeco from time to time and saw no shortage of equipment, no defective safety equipment and observed no inexperienced or incapable employees and that he did not have any reason to anticipate that the plaintiff or any other employees would fail to use the necessary safety equipment in the performance of their work. Mr. Crawford testified that he had been asked on several occasions for permission to de-energize lines and did not remember granting any specific request. However, he testified that except during the hours 11:00 A.M. to 1:30 P.M. he had told Mr. Riley, the superintendent for Safeco, that he had permission to de-energize a transformer or line section provided he notified the customer or customers

being served of such de-energization so that the customer would not be upset and would understand why the current was being cut off. Further, he testified that if he had been expressly requested for permission to de-energize the jumper "B" on which the plaintiff was injured which was connecting two primary lines which were not actually serving customers at that time that he would have given permission for such de-energization but that no such request was made to him and that he did not know that the plaintiff Jones and Mr. Arms were working on the particular pole on the day in question.

Mr. Crawford admitted that after Mr. Jones came in contact with the energized jumper that safety fuse No. 1 which was a larger fuse than safety fuse No. 2 blew out first. It was his opinion that No. 1 fuse blew prematurely and that there could have been a number of reasons for it blowing prematurely among which he listed that it was in the main three phase line tap and was carrying considerably more load or current or it could have had some damage prior to Mr. Jones' action. Mr. Crawford admitted that he never made any inspection or examination of the safety equipment furnished by Safeco nor did he investigate the qualifications of plaintiff Jones to work on hot lines.

The appellant has filed some thirty-four assignments of error. It would prolong unduly this opinion to treat each of these assignments of error separately. We have carefully read the record and examined all of the exhibits. We have given careful thought to the questions presented on this appeal. The only act of negligence of which we can find the City of Dyersburg probably guilty is in keeping energized two primary lines upon which the plaintiff was working when such lines had not been

used to supply current for about a year and there were no present plans to supply current therefrom. However, we hold that such negligence was not a proximate cause of the plaintiff's injuries because these hot or energized lines were no more dangerous and created no more of a hazard to plaintiff than the other hot lines he was working on.

We hold that the great preponderance of the evidence is that the plaintiff's injuries were the direct and proximate result of the combined negligence of the crew chief, Eddie Arms, in failing to cover the exposed jumper or requiring the plaintiff to cover the exposed jumper with a "gut" or a "snake" or other insulation material which was available to both of them, along with the negligence of the plaintiff in failing to cover said exposed jumper with insulation material and the further negligence of the plaintiff in reaching over and allowing his body to touch the exposed jumper when he well knew that a deadly current of 7,600 volts was coursing through said wire and that almost certain death or great bodily injury lurked only twelve inches away from him. In our opinion the decision of this case is controlled by the exception to the general law set out in the opinion of Presiding Judge McAmis in the case of Shell Oil Co. v. Blanks, 1959, 46 Tenn.App. 539, 330 S.W.2d 569. In that case it was held that the Shell Oil Company, as lessor of a filling station, owed a duty to an independent contractor and its employees to prevent such contractor and its employees from injury while painting a steel flagpole which the lessor knew to be defective. From said opinion we quote as follows:

"While there are cases to the contrary, the weight of authority is to the effect that the owner or occupier

of the land, with certain exceptions, is duty bound to use reasonable care to provide a safe place in which an independent contractor and his employees can work. Hammond v. El Dorado Springs, 362 Mo. 530, 242 S.W.2d 479, 31 A.L.R.2d 1367 and Annotation 1375; Annotation 44 A.L.R. 990; 35 Am.Jur. 590, Master and Servant, Section 161. The rule applies to instrumentalities or appliances furnished by the contractee. 57 C.J.S. Master and Servant sec. 603, p. 376.

An exception to the general rule is recognized where the risks arise from, or are intimately connected with, defects of the premises or of machinery or appliances located thereon which the contractor has undertaken to repair. As to contracts for such repair work, it is reasoned that the contract is sufficient in itself to impart notice of a defect, the extent of which the repairman must discover for himself. Hammond v. El Dorado Springs, supra, and numerous cases there cited. This is merely to say that one assumes the risk of a known danger or of an undertaking which is inherently dangerous.''

In an unreported case of Mrs. Ruth Mae Pinion, Admxr. v. Memphis Housing Authority, Inc. filed of record in this court, western section, of date April 22, 1966, from Shelby law docket, we applied the exception to the general rule mentioned by Judge McAmis and held that plaintiff's intestate Pinion who was injured while working as a laborer in the demolition of a building was not entitled to recover from the owner, Memphis Housing Authority, when a fellow servant had, unknown to plaintiff's intestate, removed some of the basement support of a wall causing the wall to fall upon such employee. Plaintiff's intestate contended that the Hous-

ing Authority was negligent in failing to furnish plaintiff's intestate a safe place within which to work. The Memphis Housing Authority reserved no right to prescribe the manner in which the independent contractor McWhorter should demolish the building nor to select the employees whom such independent contractor should hire nor the safety methods which he should observe in the demolition of the building. The Housing Authority did reserve the right to re-enter and complete the job of demolition and removal of debris if the independent contractor failed to perform his contract. We held that the plaintiff's intestate Pinion and his fellow employees assumed the risk incident to the demolition of the building when they accepted employment with the independent contractor McWhorter to demolish the building and that there was no evidence of negligence on the part of Memphis Housing Authority.

In the case at bar the City of Dyersburg had no knowledge that the plaintiff Jones was not capable of working on hot lines; on the contrary, Safeco's superintendent, Mr. Riley, who had had over fifteen years experience in such work testified that the plaintiff Jones did appear to be a capable lineman fully qualified to work on hot lines subject to the supervision of the journeyman lineman, Mr. Eddie Arms.

We hold that the City of Dyersburg was not obligated under its contract nor under its non-delegable duty as a supplier of electricity to supervise the performance of the contract by Safeco and its employees so as to prevent the employees being injured by their own negligence. It would have been impractical and would have in effect negatived the very contract which it awarded Brayton for the City of Dyersburg to have been required

to furnish men to supervise all of the phases of the electrical work being done by the subcontractor Safeco so as to prevent Safeco's employees from injuring themselves.

■■■ The plaintiff Jones knowingly and voluntarily assumed the risk of injury or death from working with hot lines and he was injured as a direct result of the combined negligence of the plaintiff and his crew chief, Eddie Arms. See Walters v. Kee, 51 Tenn.App. 261, 366 S.W.2d 534, for discussion of terms "assumption of risk and contributory negligence."

■■■ The city had a legal right to require the construction work on its electric system to be performed under a "hot contract" and it was not negligence for the city to make such requirement nor was it actionable negligence insofar as the plaintiff is concerned for the city to refuse to de-energize any power line so long as the plaintiff was fully informed that the wire or wires were in fact hot.

Plaintiff Jones himself testified that he was fully qualified and experienced to work on hot lines and knew all the dangers attendant thereto. He further testified that he knew that the particular jumper which he subsequently touched, unintentionally, of course, but nevertheless negligently, was a hot line and very dangerous. The record affirmatively shows that there was ample safety equipment available both to crew chief Eddie Arms and plaintiff Jones to have protected themselves from the danger of hot lines on which they were working if they had simply used such available equipment.

We respectfully disagree with His Honor the Trial Judge that the City of Dyersburg was negligent in failing

to furnish or lend mechanical jumpers to Safeco for use by its employees and in failing to inspect the safety equipment furnished by Safeco for the protection of its workmen. Safeco was under obligation to furnish the safety equipment; an engineer employed by the city had approved Safeco as a company capable of carrying out the contract; the City of Dyersburg was not put on notice that any of the employees of Safeco were not capable of doing the tasks assigned to them or that any of the safety equipment was defective. Mr. Riley testified that he did have some safety equipment which was inferior or defective but there is no proof that the city was chargeable with notice of such inferior equipment and there is no proof that the use of such inferior equipment was a cause of the plaintiff's injuries.

There was testimony that on at least one occasion during the course of construction by Safeco a line had burned in two. There is no proof that it burned because of incapacity on the part of employees of Safeco to perform the job adequately and no proof as to what actually caused the line to burn in two.

It is the contention of appellee that the unexplained burning of the primary line indicates that the circuit breaker did not function properly and that the city officials were put on notice of the inefficiency and incapacity of Safeco employees and were guilty of negligence in failing to have the breakers and fuses set so as to kick off all current if a workman touched a wire. The breakers are set to open up and shut off the current when an obstruction touches the line then in a very short time to close, re-establishing the circuit, if the obstruction has not cleared to shut off the current then reopen the current and then close permanently if the obstruction

has not cleared. These relays are furnished by Tennessee Valley Authority, are kept under lock and key and are set only by representatives of TVA. The preponderance of the evidence is that they are set to take care of all types of obstructions touching primary lines and not just for the purpose of protecting workmen against their own negligence. We hold that the evidence preponderates against the finding of the court below that the fuses and relays were negligently set and maintained.

Also we hold that the evidence preponderates against the finding of His Honor the Trial Judge that the City of Dyersburg retained full possession and control of the transmission wire upon which the plaintiff was injured. The particular jumper with which the plaintiff came in contact was made and installed by the plaintiff himself from wire furnished to the plaintiff by the Safeco superintendent, Mr. Riley, and there is no proof that the City of Dyersburg exercised any supervision or control in the making of the temporary jumper and the lowering of the cross-arms.

It is further the opinion of this court that even if it could be said that the City of Dyersburg was guilty of proximate negligence we would still have to dismiss plaintiff's suit because of his proximate contributory negligence. The proof is uncontradicted that on the morning of the accident the plaintiff was standing on a pole looking at an uninsulated jumper wire only twelve inches away which he himself had fashioned and installed and which he knew carried 7,600 volts of deadly electricity and yet in reaching up to grasp and remove a rope he allowed himself to come in contact with this hot jumper wire and was severely burned. The plaintiff is guilty of proximate contributory negligence as a matter of law.

There is absolutely no evidence of such gross or wanton negligence on the part of the City of Dyersburg as to preclude its right to rely upon the defense of contributory negligence as was present in Inter-City Trucking Co. v. Daniels, 181 Tenn. 126, 178 S.W.2d 756.

All of the holdings of the lower court in conflict with this opinion are reversed. The assignments of error relating thereto are sustained. All other assignments of error are pretermitted as not presenting determinative questions of law or fact.

The judgment of the lower court will be reversed and judgment will be entered in this court dismissing plaintiff's suit. The costs in the court below and in this court will be taxed against the plaintiff.

Avery, P. J. (W.S.), and Bejach, J., concur.