Roy WILSON et ux., Carolyn Wilson,
Petitioners-Plaintiffs,

v.

ELECTRIC POWER BOARD OF CHAT-
TANOOGA, Respondent-Defendant.

Supreme Court of Tennessee.

Oct. 11, 1976.

Rehearing Denied Nov. 29, 1976.

Jack R. Brown, Chattanooga, William G. McPheeters, Dayton, for petitioners-plaintiffs.

Brian C. Smith, Don E. Warner, Thomas, Leitner, Mann Warner & Owens, Chattanooga, for respondent-defendant.

## OPINION

HARBISON, Justice.

This action for personal injuries was instituted by a lineman and by his wife for electrical burns which he sustained while undertaking to repair a transmission line. The line and a pole had been broken by a falling tree during an ice storm. The trial jury found in favor of the plaintiffs, petitioners here. The Court of Appeals reversed and dismissed, holding that the respondent Power Board was entitled to a directed verdict. It found no evidence of breach of duty by the respondent to the petitioner Wilson and also held that he was guilty of contributory negligence as a matter of law.

Our review of the record leads us to the conclusion that, taking the evidence in its most favorable light to the petitioners, a jury issue was presented as to the negligence of the respondent and as to the contributory negligence of the petitioner. The case was an extremely close one, however, and we find that the instructions given by the trial judge as to the duty owed by the respondent to the petitioner was erroneous, and that the charge failed properly to delineate the issues to be resolved by the jury. Accordingly we reverse the judgment of the Court of Appeals and remand the case to the trial court for a new trial.

On January 9, 1973, petitioner Roy Wilson, a lineman for Dillard Smith Construc-

tion Company, sustained electrical burns while working on respondent's transmission lines. Petitioner and other employees of Dillard Smith, under the supervision of their foreman, Sherman Sherrill, were dispatched by radio from the Power Board to remove a tree and make necessary repairs to broken lines on Lookout Mountain near Chattanooga. Although the contract between Dillard Smith Construction Company and the Power Board is not in evidence, there was testimony that such a contract existed, and that Dillard Smith was performing the work as an independent contractor "under its own clearance". According to the testimony, this term meant that the employees of the contractor were responsible for working on the lines in an energized condition or were required to take their own measures to ground the wires or otherwise de-energize them, and that the wires were not de-energized by the Power Board as would be done when the contractor was working under a "cut-off" order.

The Power Board advised the repair crew where switches and controls in the vicinity were located. Late in the afternoon on January 8, 1973 the crew found the trouble site, and thereupon the foreman, petitioner Wilson and other employees went to the poles upon which the controls were situated.

Two sets of lines were involved, the higher lines containing twelve thousand volts and the lower lines four thousand volts. An employee of the construction company climbed the pole upon which clamps were located controlling the twelve thousand volt lines, and he loosened these clamps so as to de-energize these lines.

Upon a separate and different pole, fuses had been installed by the Power Board by means of which the four thousand volt lines could be de-energized. Neither the petitioner nor any other employee of Dillard Smith Construction Company climbed the pole upon which these fuses were situated. Petitioner and his foreman inspected these fuses from the ground, and saw that fuse boxes on the four thousand volt lines were in an open position. From this they as-

sumed either that someone from the Power Board had preceded them to the site and opened the fuses, or that the fuses had opened automatically, so as to de-energize the line. Because of ice, snow and poor visibility, petitioner and other members of the crew failed to observe that there were two sets of fuses on these four thousand volt lines, one of which was referred to in the record as a "knifeblade" fuse, which could only be opened or disconnected manually.

After ascertaining to their satisfaction that all lines had been de-energized, the crew proceeded to remove a broken pole farther toward the terminus of the line, reset it, splice the broken wires and replace them. They worked until after midnight on January 8 and returned to the site the next morning at about 8:30 to complete their work. On this occasion the foreman again walked down the line to the poles where the controls were situated. He ascertained that the "hot clamps" on the high voltage lines were still open and that the fuse boxes on the four thousand volt lines were still in an open position. Again, because of ice, snow and fog he failed to observe the knife blade switches on the latter set of lines.

Petitioner Wilson climbed the new pole which had been set the night before, and was undertaking to fasten one of the four thousand volt lines in place when he sustained the injuries complained of. He testified that he "fuzzed" the line with his hammer before handling it, and that it produced no spark. However, the line was either energized at that time or became energized shortly thereafter, and the petitioner sustained electrical shock and burn while attempting to lift the ice-coated wire into position.

■ Sharp issues as to contributory negligence were made, there being testimony that numerous safety devices and practices could have been utilized by the repair crew to prevent electrical shock even while working on energized lines.

There was testimony offered on behalf of petitioner, however, that it was unusual in the Chattanooga area for the Power Board to maintain lines with a dual set of fuses or switches such as were involved in the present case. While the "knife blade" switches and the wires leading to them were ordinarily visible from the ground, there is material evidence that they were not visible under the icy, foggy weather conditions obtaining on the night of January 8 and on the morning of January 9. To this extent, therefore, the Court of Appeals did not view the evidence most favorably to the petitioner when it stated that:

"The uncontroverted evidence shows that all the switches were obvious and plainly visible to the plaintiff and his fellow employees."

The Court of Appeals also failed to give petitioner the most favorable view of the evidence when it stated that an employee of the contractor climbed the pole on which the dual switches or fuses were located. The pole which he climbed was the one on which were situated clamps controlling the twelve thousand volt lines. These clamps had been loosened by means of a "hot stick". While Mr. Sherrill's testimony is not entirely clear, plaintiff himself testified:

"Q. Now, that pole that you used the hot stick on is the same pole that the fuses are on, isn't it?

"A. No, sir.

"Q. It's a different pole?

"A. Yes, sir."

The Court of Appeals apparently concluded that a member of the repair crew climbed the pole on which the knife-blade fuses were located, in close proximity to them, so that he would necessarily have observed them. This is not the fact situation, as we understand the record, and we believe that a jury issue was presented as to whether or not the repair crew, including the petitioner, did or did not act reasonably in failing to detect the knife-blade switches, under the icy and adverse weather conditions then obtaining. It was also for the jury to determine whether petitioner and the other members of his crew acted rea-

sonably or otherwise in assuming that the four thousand volt lines were de-energized, based upon their observation of one set of fuses in an open position, particularly in light of the testimony that it was not standard practice to have more than one set of fuses on transmission lines in the area.

Accordingly, we do not believe that the Court of Appeals, in its review of the case, accorded to petitioners the most favorable view of the evidence and all legitimate inferences to be drawn therefrom. Upon the present record, we are of the opinion that jury issues were presented, and that the trial court properly overruled the motion of respondent for a directed verdict.

Under its disposition of the case, the Court of Appeals did not consider other assignments of error which had been properly made and preserved for appellate review by the respondent.* We have considered these, and find one of them to be well taken. Both at the time they were given and in motion for a new trial, counsel for respondent objected to the instructions of the trial judge as to the duty owed by the respondent to the petitioner Wilson.

■ Wilson was an employee of an electrical contracting company. The Power Board was entitled to assume that the contractor and its employees were experts in dealing with electricity. The nature of the duty owed by the respondent under these circumstances was a crucial issue in the trial, and the charge of the court to the jury on the issue was extremely important, perhaps controlling. The trial judge did not at any point delineate for the jury any of the theories or contentions of the parties or the issues to be resolved by the jury. There were numerous allegations of negligence contained in the complaint, most of which were unsupported by the proof. There was no evidence of any violation of statutes or electrical codes, and since the contracting firm was operating "under its own clearance", there was no evidentiary basis for the allegation in the complaint that the Power Board was negligent in re-energizing

the lines. It is obvious that the line upon which petitioner was injured became energized in some manner. Whether this was done by the Power Board or resulted from a "feed-back" from a generator at the terminus of the line is unclear. Nevertheless there was sufficient evidence from which the jury could have inferred that the Power Board did in fact re-energize the line, but under the circumstances of this case such re-energizing could not and should not have been considered an act of negligence, although this was alleged in the complaint.

■ The only instruction given by the trial judge to the jury with respect to the duty owed was as follows:

"It is the duty of the Electric Power Board to exercise the highest degree of care consistent with the business of transmitting electricity to maintain its premises or the pole, in this instance, in a reasonably safe condition for the plaintiff using the premises, or the pole, and if there were dangers that were not obvious to the plaintiff of which the Power Board or the defendant knew or with reasonable care should have known, it was the duty of the Power Board to eliminate such dangers or to give warning thereof. Now liability in this type of case is grounded upon the superior knowledge of the Power Board of the danger over the plaintiff lineman in this case. it is when the dangerous condition is known to the Power Board and not to the plaintiff, Roy Wilson, that a recovery is permitted."

We do not consider these to be adequate or entirely accurate instructions. The reference to "the pole" is somewhat imprecise and inaccurate. There was no general duty upon the Power Board to make safe the very pole upon which plaintiff was working. It was this pole which had been reset the night before, and the erection and connection of the lines thereupon was the very work which the petitioner and his crew had been called upon to perform.

If there were any negligence upon the part of the Power Board on this record, it

* See T.C.A. § 27–823.

consisted in maintaining a dual set of switches upon another pole, other than that upon which petitioner was working, or in failure to give warning thereof. Since the petitioner and the repair crew were expert electricians, called upon to repair a known defect or damaged condition in the power lines, in our opinion, they were owed reasonable care under the facts and circumstances then obtaining.

It is true that in several cases, high tension electric lines have been referred to as dangerous instrumentalities, and with respect to third persons a distributor of electricity has been said to owe the "highest degree of care". This has been particularly true in connection with claims made by members of the public or by industrial workers or craftsmen brought into close proximity to high tension lines by their employment.[1]

■ With respect to linemen, however, and persons employed for the specific purpose of erecting or repairing transmission lines, we are of the opinion that the duty should be expressed in terms of reasonable care, commensurate with the risks and dangers involved. These persons properly make use of the facilities or premises maintained by the power company, and are owed a duty which may indeed involve a great amount of care, and which is not delegable. However, we think that to designate this the "highest degree" is misleading, under circumstances such as those shown here. Further, the duty to warn or make safe only applies to latent or hidden dangers which the lineman could not reasonably be expected to discover. The fact that the dangerous condition is not "known" or "obvious" to the worker is not controlling if he could fairly and reasonably be expected to

see or discover it for himself. At no point was this explained to the jury.

Probably the leading Tennessee case upon the duty owed by the owner of premises to employees of contractors called there for the purposes of making repairs is the case of *Shell Oil Co. v. Blanks*, 46 Tenn.App. 539, 330 S.W.2d 569 (1959). There the duty was expressed in terms of ordinary reasonable care, including a duty to warn or to make safe with respect to latent or hidden dangers or with respect to risks separate and distinct from those created by the conditions to be repaired under the contract.

In the case of *Pierce v. United States*, 142 F.Supp. 721 (E.D.Tenn.1955), a lineman sustained injuries while working near a supposedly de-energized line. In that case the court observed that no electrical lineman is "justified, or in law may, presume his place of work is safe". 142 F.Supp. at 728. Nevertheless the Court pointed out that the owner or distributor of electricity has a nondelegable duty to see that *"reasonable means"* are taken to protect those who come into contact with it. The Court said:

"Failure to fulfill that duty results in liability on the part of such individual, even though the plaintiff's injury resulted in whole or in part from the acts or omissions of an independent contractor employed to perform the particular work." 142 F.Supp. at 729.

See also *Paul v. Staten Island Edison Corp.*, 2 A.D.2d 311, 155 N.Y.S.2d 427 (App. Div.1956) ("reasonable care"); *Florida Power & Light Co. v. Robinson*, 68 So.2d 406 (Fla.1953) ("high degree of care"); *Palenscar v. Michael J. Bobb, Inc.*, 439 Pa. 101, 266 A.2d 478 (1970) ("reasonable care", as set out in Restatement (Second) Torts § 343 (1965)).

1. E. g., *Phelps v. Magnavox Co.*, 62 Tenn.App. 578, 466 S.W.2d 226 (1971) (roofer working near lines); *City of Chattanooga v. Shackleford*, 41 Tenn.App. 734, 298 S.W.2d 743 (1956) (roofer); *International Harvester Co. v. Sartain*, 32 Tenn.App. 425, 222 S.W.2d 854 (1948) (steel worker). The phrase was also used with respect to the duty owed to a lineman in the case of *Jones v. City of Dyersburg*,

59 Tenn.App. 354, 364, 440 S.W.2d 809 (1967), but only in a comment upon the sufficiency of pleadings "absent any testimony". This was a non-jury proceeding and elsewhere in the opinion the Court stated that the case was controlled by the principles of *Shell Oil Co. v. Blanks*, 46 Tenn.App. 539, 330 S.W.2d 569 (1959), where "reasonable care" was held to be the standard.

We do not believe that the instructions given in this case conform to the reported cases on the subject or that they gave sufficient guidance to the jury to enable them accurately to resolve the factual issues presented.

The judgment of the Court of Appeals is reversed and the cause is remanded to the trial court for a new trial as to all issues. Costs accrued in the action will be divided equally between the parties. Costs of the new trial will abide the result thereof.

COOPER, C. J., and FONES and BROCK, JJ., concur.

HENRY, J., filed separate opinion, concurring in part; dissenting in part.

. HENRY, Justice (concurring in part; dissenting in part).

## I.

### Concurring

I concur in so much of the majority opinion as holds that jury issues were presented, and the trial court properly overruled the motion for a directed verdict.

There was ample material evidence from which the jury would have been warranted finding:

a. That the use of a dual fusing system was unusual under the modern state of the art.

b. That such use should have been called to the attention of the maintenance crew.

c. That the failure to warn of this obsolete system was a breach of duty on the part of the Power Board.

d. That the knife blade switches were not visible on the night before, or the day of, the accident because of ice, fog and snow.

e. That the maintenance crew had no reason to suspect a dual switching system and, therefore, had no duty to look for the knife blade switch.

f. That the lines were dead on the night before the accident.

g. That some time during the night the lines were re-energized at the substation or there was a feed-back from the auxiliary system, with the result that the lines were "hot" the next morning.

h. That in either event the Power Board was under a duty to warn.

i. That a breach of these duties was the proximate cause of plaintiff's injuries and damages.

In any event, under appropriate standards of appellate review, these were jury issues.

## II.

### Dissenting

The Trial Judge charged the jury, in part, as follows:

It is the duty of the Electric Power Board to exercise the highest degree of care consistent with the business of transmitting electricity to maintain its premises or the pole, in this instance, in a reasonably safe condition for the plaintiff using the premises, or the pole, and if there were dangers that were not obvious to the plaintiff of which the Power Board or the defendant knew or with reasonable care should have known, it was the duty of the Power Board to eliminate such dangers or to give warning thereof. Now, liability in this type of case is grounded upon the superior knowledge of the Power Board of the danger over the plaintiff lineman in this case. It is when the dangerous condition is known to the Power Board and not to the plaintiff, Roy Wilson, that a recovery is permitted.

The majority holds that these instructions were neither "adequate or entirely accurate instructions". I disagree. It even faults the trial judge for referring to "the pole", holding this to be "somewhat imprecise and inaccurate". With utmost deference to my colleagues, this is "reaching" for a reason.

I would hold the charge to be both adequate and accurate. Had the trial judge stopped immediately after charging "[i]t is the duty of the Electric Power Board to

exercise the *highest* degree of care", the charge would have been both inadequate and inaccurate. But, he did not stop. He went on to charge:

> . . . if there were dangers that were *not obvious to the plaintiff* of which the Power Board or the defendant *knew* or with reasonable care *should have known,* it was the duty of the Power Board to *eliminate such dangers* or to *give warning* thereof. Now, liability in this type of case is grounded upon the superior knowledge of the Power Board of the danger over the plaintiff lineman in this case. It is when the dangerous condition is known to the Power Board and not to the plaintiff . . . that a recovery is permitted. (Emphasis supplied).

The trial judge is to be commended for a succinct, adequate and accurate statement of the applicable law in a case involving an independent contractor working under its own clearance. True, he could have gone further and deeper into the subtle nuances of the law, but there is no requirement that a trial judge's charge be couched in the erudite phraseology of a law review article, nor that it be encyclopedic in nature. Indeed such is not desirable. It is intended merely to give the jury a general insight into the applicable law.

Under Tennessee law, an independent contractor assumes the risk of a known danger, but the owner has a duty to warn of a hidden danger, to those who are without actual or constructive notice. *Shell Oil Company v. Blanks,* 46 Tenn.App. 539, 330 S.W.2d 569 (1959). Under the same authority, our courts adhere to the view that an exception to the general duty on the part of the owner to provide a safe place to work, exists in those cases "where the risks arise from, or are intimately connected with, defects of the premises, or of machinery or appliances . . . which the contractor has undertaken to repair." 330 S.W.2d at 571. Nor may the doctrine of assumption of the risk be involved where there is a risk

"separate and distinct from those created by the defects to be repaired". 330 S.W.2d at 571–72. And under such circumstances the owner has a duty to warn of hidden dangers. *Ibid.* See also *Dempster Bros., Inc. v. Duncan,* 61 Tenn.App. 88, 452 S.W.2d 902 (1969).

This is, in substance, what the trial judge charged.

The trial proceedings shed significant light upon the sufficiency of the charge and also provide substantial insight into the conscientious effort made by the trial judge to enlist the aid of counsel in an effort to instruct the jury accurately and adequately.

The record shows a lengthy colloquy between the court and counsel on the matter of the duty and standard of care, with the court soliciting the aid of counsel. Counsel representing the Power Board at one point, exclaimed, "I don't know the duty".

The court specifically told counsel:

I would like for you to write down what you say the duty is for me to charge this jury. . . .

Thereafter he advised counsel precisely what he wanted, and gave them until the next day to present this matter to him.[1]

When the court reconvened the next day, counsel for the Power Board read briefly and commented on (15 lines in the Bill of Exceptions), *Jones v. City of Dyersburg,* 59 Tenn.App. 354, 440 S.W.2d 809 (1967), but presented no special requests.

Counsel for plaintiff submitted seven (7) special requests, however, these do not appear in the record.

I find it difficult to rationalize holding a trial court in error on the basis of a charge where complaining counsel failed to respond to the trial judge's request for assistance. The Power Board was represented by capable and experienced trial counsel. Brief research would have enabled the presentation of appropriate special requests. I cannot condone his standing idly by, withhold-

---

1. Court adjourned at 4:00 o'clock p. m. prevailing time and reconvened the next day at 9:00 o'clock, a. m.

ing the requested assistance, and then charging the trial judge with error.

The trial judge did his homework and his charge was correct.

Assuming *arguendo* that the charge was meager or inadequate, this is not fatal. As the late Chief Justice Burnett said, in *Bluff City Buick Co. v. Davis,* 204 Tenn. 593, 323 S.W.2d 1 (1959):

This Court has held for more than 100 years that we would not reverse a case for meagerness, inadequacy, etc., or failure to give a charge *unless a special request is asked which correctly sets forth the points to be charged.* (Emphasis supplied).

204 Tenn. at 602, 323 S.W.2d at 5.

I deplore the tendency sometimes shown by appellate courts to expect trial judges, in their charges, to be extemporaneously and spontaneously as thorough in their exposition of the law as appellate judges are—or should be—in judicial treatises originating in the rarefactive atmosphere of their appellate judicial chambers. This great expectation is founded in fallacy.

Until the State of Tennessee recognizes that her trial judiciary deserves and needs adequate court rooms, adequate library facilities and, more importantly to this issue, a fulltime law clerk, we are going to continue to have meager—and sometimes inadequate—charges. It is impossible for a trial judge, working under a tight schedule and attempting to manage a heavy case load, to sit the trial bench, coping with the increasingly complex issues of legal controversies, forced to "shoot from the hip" as he rules on evidentiary problems, dealing with counsel "working in the pits" in a fierce adversary system, to give the thought and attention to jury charges that cases demand and justice requires.

I am not willing to reward their best efforts with reversal merely because a charge, intended for lay consumption, does not measure up to law review standards of legal erudition.

I would affirm.