James Douglas DEMPSEY, as Administrator of the Estate of James Timothy Dempsey, Deceased, Plaintiffs–Appellants,

v.

CORRECT MANUFACTURING CORP., Fayetteville Electric System, City of Fayetteville, James Carter, d/b/a Tennessee Alabama Line Maintenance, Defendants–Appellees.

Court of Appeals of Tennessee, Middle Section.

April 13, 1988.

Permission to Appeal Denied by Supreme Court July 18, 1988.

Pat M. Fraley, Fayetteville, Cecil D. Branstetter, Nashville, for plaintiffs-appellants.

Tom Corts, Nashville, Charles Holt, Jr., Lawrenceburg, Larry E. Staats, Columbus, Ohio, for defendants-appellees.

## OPINION

TODD, Presiding Judge.

This is a wrongful death case in which the plaintiff-administrator has appealed from a summary judgment dismissing his suit against the Fayetteville Electric System and the City of Fayetteville.

The suit was originally filed against Correct Manufacturing Corp., Fayetteville Electric System, City of Fayetteville, and James Carter, d/b/a Tennessee Alabama Line Maintenance. The record shows no disposition of the suits against Correct Manufacturing Corp. and James Carter, d/b/a, etc. Absent a disposition of said suits, the dismissal of Fayetteville Electric System and City of Fayetteville is not a final judgment appealable as of right. T.R.A.P. Rule 3(a). Since the appeal from a partial judgment has been briefed and argued without challenge, the infirmity will be waived, and the appeal will be determined upon its merits.

The sole issue for review is stated by appellant as follows:

Whether safety regulations adopted under authority of T.C.A. §§ 50–3–104, 201, and 917 and safety rules incorporated by reference in T.C.A. § 68–16–104 impose a nondelegable duty upon a electric system to furnish a safe work place for employees of a subcontractor; put differently, whether a violation of the safety regulations and rules is negligence per se?

Fayetteville Electric System (hereafter the System) is an electrical energy distribution system owned and operated by the City of Fayetteville. Correct Manufacturing Corp. is the alleged manufacturer of a truck-mounted boom which contacted a high voltage conductor of the System at a time when deceased was touching the truck, resulting in his electrocution. James Carter is engaged in the business of tree-trimming under contract to the System and was the employer of deceased at the time of the electrocution.

At the time of the fatal incident, the employees of Carter were not actually trimming trees or vegetation. They were engaged in greasing the cables which controlled the crane. When the crane was extended to facilitate the lubrication, it contacted a high voltage overhead conductor of the System, thereby energizing the truck which deceased touched while standing on the ground.

As to the defendants System and City, the complaint alleges:

The injury and fatality of James Timothy Dempsey was caused by reason of negligence, gross negligence and negligence per se of the Fayetteville Electric system which maintained its electrical transmission lines in a condition causing unnecessary peril to life and limb, and alternatively, the injury and fatality of James Timothy Dempsey was caused in whole or in part by reason of conduct or a lack thereof by the Fayetteville Electric System, which includes but it not solely limited to (1) failure to furnish a safe place to work; (2) failure to properly maintain safety devises and appliances; (3) failure to keep in place proper safety devises and appliances; (4) violations of

prescribed standards as applicable under circumstances then attendant, the same being in regard to safely transmitting electricity by transmission lines, including but not limited to a violation of safety codes and standards specified by the American National Standard National Electrical Safety Code, OSHA Safety and Health Regulations for Construction, American National Standard for Vehicle-Mounted Elevating and Rotating Aerial Devices, and American National Standard for Tree Operations.

The answer of the System and City asserts the following affirmative defenses:

1. The complaint fails to state a cause of action against either defendant.

2. The defendants have complete immunity for the allegations set forth in this complaint and immunity has not been removed pursuant to the provisions of T.C.A. § 29–20–201 et seq.

3. The plaintiffs have failed to give proper notice to the defendant pursuant to the provisions of T.C.A. § 29–20–301, 302 and 303.

4. The amount of recovery of the plaintiffs is limited by the provisions of T.C.A. 29–20–311 et seq.

5. The plaintiff was guilty of contributory negligence.

6. The plaintiff assumed the risk of his injuries.

7. The injury and death of the plaintiff was the result of negligence of others over whom these defendants had no control nor right to control.

The motion for summary judgment states simply:

Comes now the defendant Fayetteville Electric System, City of Fayetteville, and moves the court for summary judgment pursuant to Rule 56 of the Tennessee Rules of Civil Procedure. Defendant would show to the Court that there is no genuine issue as to a material fact.

The record contains an unfiled document entitled "Statement of the Case" which appears to be a brief in support of the motion for summary judgment. Said document states in part:

Plaintiff is the administrator of the estate of his son, who was electrocuted on April 11, 1985 while working on a job for Tennessee–Alabama Line Maintenance, Inc. (Hereinafter referred to as TALM). On that date, TALM was operating under contract to the defendant Fayetteville Electric System (Hereinafter referred to as Fayetteville) to cut, remove and trim trees, shrubbery and brush from the lines and equipment of Fayetteville. A copy of that contract is attached hereto as Exhibit A.

The record also contains responses to interrogatories propounded to the plaintiff by the System and City. Those responses material to the motion for summary judgment are as follows:

1. State in details how the defendant, Fayetteville Electric System failed to furnish a safe place to work. State specifically what was unsafe about the working place and how the City of Fayetteville was responsible for that lack of safety.

RESPONSE: Rules 400, 401.A.1, and 410.C.1 of the National Electric Safety Code (NESC) ANSI C2 clearly require that the system operator (Fayetteville Electric System) has the responsibility for the safe operation and maintenance of the power lines. It was the duty of the Fayetteville Electric System under Rule 411.A.1 to restrict the access to those power lines to only authorize personnel who were instructed and trained in safe operations, and restrict operations to the use of safe and properly used maintenance equipment. The operations being performed by the tree trimming crew were being performed in an unsafe and dangerous manner by untrained individuals. There was a clear violation of Rule 422.A.6 in not having grounded the truck.

2. State specifically what safety devices and appliances the City of Fayetteville failed to maintain or keep in place and state specifically how these approximately caused the accident and how the City of Fayetteville Electric System or the City of Fayetteville was responsible for these failures.

RESPONSE: No equipment grounding cable was provided on the truck or the device for this grounding purpose. Evidently, Sections 3.1, 4.1, 4.2, 5.1 and 5.2 of the ANSI Z133.1 were not complied with by the employer or the Fayetteville Electric System as the system operator. Although the truck belongs to the contractor, it was being used with the knowledge and approval of the Electric System. In any case, the responsibility for safe operation and maintenance, of which tree trimming is a part, is placed on the Electric System by Rules 400 and 410.C.1 of the National Electric Safety Code (NESC) ANSI–C2, which is adopted by law in the State of Tennessee

3. State specifically any violations of prescribed standards violated by any of these defendants in regard to:

a. The American National Standard Electric Safety Code,

b. OSHA Safety and Health Regulations for Construction,

c. American National Standard for vehicle-mounted elevating and rotating aerial devices, and;

d. American National Standard for tree operations.

RESPONSE: a: Rules 92.B.1, 211, 400, 410.A.1, 410.C.1, 411.A.1, 422.A.6.

b. 29 CFR 1926.952(b)(2), 29, CFR 1926.21.

c. Section 4.10.6(1) & (2) of ANSI A92.2.

d. Sections 3.11, 4.1, 4.2, 5.1 & 5.2 of ANSI Z133.1.

4. In answering the above questions, state what specific facts you have which indicate that these defendants may have violated these standards.

RESPONSE: Mr. Dempsey was electrocuted while in the employ of Tennessee–Alabama Line Maintenance, Inc., who were under contract to the Fayetteville Electric System, and while employed in a tree trimming operation along the power lines on Old Elkton Pike. Mr. Dempsey, a ground man, was in physical contact with the right (passenger) side of the truck. Mr. Robert Meeks, the crew foreman, was standing in the street on the left (driver) side of the vehicle. Mr. Ronnie Baker, the operator, was in the bucket of the lift. The bucket is an insulated bucket, as is the upper portion of the boom. The lower portion of the boom and the frame of the truck are conductive. The truck was isolated from ground (earth ground) by being mounted on rubber tires, with the exception that the outriggers were in contact with earth ground. No grounding cable was in place to attach or connect the metal frame of the truck and other conductive surfaces to ground (system ground). No barriers were in place to prevent employees or any other persons from approaching the truck during operations. The crew was in the initial stage of the operation and were greasing the cables associated with the boom. Mr. Baker had raised the boom to a height equal to or greater than the height of the 7200 volt primary phase conductors. He was then rotating the boom to the left (toward the phase conductor). The conductors involved were those associated with a 12,470 volt/7200 volt-three phase distribution system, there being 12,470 volts between the two phases and 7200 volts between any particular phase and system neutral or ground. The equipment was being operated within 10 feet of the energized phase conductors. The horizontal distance between the edge of the truck and the closest phase conductor was 5½ feet. A pole ground was attached to the system neutral conductor on pole # 28. The truck was approximately 25 feet from pole # 28. An event occurred (either the blowing of the right front tire of the vehicle or the continued rotation of the boom) that resulted in the knuckle of the boom coming in contact with the phase conductor. This energized the lower portion of the boom and the truck with a voltage gradient of 7200 volts being dropped across the earth surface between the truck and the pole ground. When this occurred a portion of the fault current passed through the body of Mr. Dempsey, and he was electrocuted.

5. You have alleged that the Fayetteville Electric System maintained its lines

in a condition causing unnecessary peril to life and limb. State specifically what these defendants did wrong in the maintenance of their lines and state specific facts as to why these lines were dangerous or unreasonable.

RESPONSE: Failed to maintain safely grounded maintenance equipment (the aerial lift truck) in violation of Rules 211, 401, 410A.1, 410.C.1 and other rules of the National Electrical Safety Code (NESC) ANSI–C2 and other national consensus standards and OSHA Regulations.

The record also contains the affidavit of Walter Szelich, Jr., general manager of the System to the effect that the System had contracted with Carter to trim trees and brush away from the power lines of the System; that Carter was an independent contractor and the System has no control or right to control the daily operations of Carter; that Carter was competent and well qualified to perform the contract, and that the affiant had no knowledge of any information otherwise.

The record contains "Collective Exhibit D", not authenticated by affidavit or otherwise, which purports to be a copy of regulations for handling energized equipment or lines.

In *Cooper v. Metropolitan Government, etc.*, Tenn.App.1981, 628 S.W.2d 30, the deceased was an employee of a firm which contracted with the Electric Power Board to trim trees and other vegetation in the vicinity of the power lines of the Power Board. A fellow employee of deceased was trimming trees from a bucket suspended on a crane mounted on a truck of the contractor. Deceased was gathering the trimmings which fell. The crane on the truck contacted a high voltage wire, thereby charging the truck which was touched by deceased with fatal results. The grounds of liability of the Power Board as stated in the complaint were:

Defendant Nashville Electric Service failed to exercise the care resting upon it to ensure its contractor was a proper person to perform an admittedly hazardous and dangerous work and that its equipment was suitable and reasonably safe for the work around the energized power lines of said Service. Nashville Electric Service also failed to exercise due care to see that the work was being performed in a reasonably safe manner and failed to insist that its contractor have its equipment electrically tested although said Service has many items of equipment of similar nature which it periodically tests and maintains in first class condition, and this defendant failed to give its contractor's equipment any inspection whatsoever although it was readily apparent that the equipment was dirty and in need of attention and proper maintenance. Even a most cursory visual inspection of the inside of the lower boom would have revealed that the isolator rods were missing. 628 S.W.2d at p. 31

Affidavits filed in the case showed:

1. Nashville Electric Service contracted with five tree trimming services for work in various parts of its service area. Queen's was one of the contractors used.

2. The work in question was being performed under a written contract. Barry Wesley Cooper was an employee of Queen's.

3. Queen's had done work for the Nashville Electric Service for twenty years in a satisfactory manner.

4. The contract specifically removed from Nashville Electric service the right to "direct or control the manner, means and method by which the work shall be accomplished."

5. The contract acknowledged that Queen's was "apprised of, conscious of and understands the imminent danger inherent in the work required" and accepted on behalf of Queen's the "duty and sole responsibility to notify and inform its personnel, employees and subcontractors and to keep them informed."

6. Nashville Electric Service did not inspect nor test any of Queen's equipment, nor did it monitor the work done by Queen's to see that it was performed in a safe manner.

The Trial Judge granted summary judgment for Nashville Electric Service and dismissed the action. From that decision an appeal has been perfected. 628 S.W.2d at p. 31.

This Court affirmed a summary judgment dismissing the Power Board and said:

[2]....

Assuming that work involved in this case was inherently dangerous and conceding that an employer may not contract away his liability to the general public for harm caused in the performance of that activity, a question remains as to whether that liability extends to employees of the contractor. Some courts have held an employer liable to the employee of a contractor for injuries arising in the performance of inherently dangerous work. (citing authorities) Other courts have made a distinction between the public at large and the employees of the contractor. In those states the employer's liability is only to members of the general public and does not extend to employees of the contractor. (citing authorities)

This question apparently has not been decided directly in Tennessee although authority for the latter position can be found in the case of *Jones v. City of Dyersburg,* 59 Tenn.App. 354, 440 S.W.2d 809 (1967). In that case an employee of a subcontractor was injured while working on power lines owned by the City of Dyersburg. In that case the allegations against the City were that it had not provided the workman a safe place in which to work and that it had a duty to the workman of the subcontractor based on the inherently dangerous nature of the work. However, the Court of Appeals in reversing a judgment for the workman against the city said:

We hold that the City of Dyersburg was not obligated under its contract nor under its nondelegable duty as a supplier of electricity to supervise the performance of the contract by Safeco and its employees so as to prevent the employees being injured by their own negligence. It would have been impractical and would have in effect negatived the very contract which it awarded Brayton for the City of Dyersburg to have been required to furnish men to supervise all of the phases of the electrical work being done by the subcontractor Safeco so as to prevent Safeco's employees from injuring themselves.

59 Tenn.App. at 392–93, 440 S.W.2d at 826.

[3] We think this is authority for the rule of nonliability of an employer to employees of a contractor even though the contract involves work that is inherently or intrinsically dangerous. We also think this is the preferable rule....

The employees of the contractor are not without a remedy. In most cases they will be covered by worker's compensation which covers them regardless of their own negligence or they will have an action against their employer.

Therefore, we conclude that the liability of an employer contracting for the performance of inherently dangerous work does not extend to employees of the contractor.... 628 S.W.2d at pp. 32–33.

Plaintiff insists that *Cooper v. Metropolitan Government,* supra, is not controlling in this case because in the cited case, this Court did not discuss and consider various statutes and regulations regarding worker safety which are cited and relied upon in the present case. Reverting to the complaint, quoted above, it is noted that no statute is mentioned therein.

Plaintiff's brief to this Court (not the complaint) mentions T.C.A. § 68–16–104, which reads as follows:

**68–16–104. Electric safety code for electric-supply stations and lines.—**

(a) The American National Standard Electric Safety Code, edition dated September 26, 1983, prepared and published by the Institute of Electrical and Electronic Engineers, Inc., 345 East 47th Street, New York, New York, 10017, is hereby adopted by the general assembly of the state of Tennessee for application for all processes within the state of Ten-

nessee as the official electrical safety code, to provide a standard for safeguarding of persons from hazards arising from the installation, operation, or maintenance of:

(1) Conductors and equipment in electric-supply stations; and

(2) Overhead and underground electric-supply and communication lines, and work rules for the construction, maintenance, and operation of electric-supply and communication lines and equipment, and the provisions of such national electrical safety code are adopted herein by references and shall not be copied in the codified sections or provisions of the Tennessee Code.

(b) Future revisions or additions to the national electrical safety code as may be adopted, deleted, revised or changed by the aforementioned Institute of Electrical and Electronics Engineers, Inc., may be adopted, deleted, revised, or amended by the general assembly of the state of Tennessee as and when the general assembly of the state of Tennessee may elect to adopt any such revisions, additions, deletions, modifications or changes in the national electrical safety code.

It appears that the statute adopts a code of standards for the installation, operation and maintenance of electrical equipment, including "work rules for the construction, maintenance, and operation of electric supply and communication lines and equipment".

It may be argued that cutting vegetation in the vicinity of a power line is a part of the maintenance of the power line, but nothing in the quoted statute makes the owner of the power line liable for a violation of safety standards by an independent contractor hired by the power company to do the cutting.

Plaintiff's brief refers to:

certain safety and health regulations from the federal occupational Safety and Health Act (hereafter "OSHA"), and certain rules contained in the American National Standard Electrical Safety Code (hereafter "NESC"),

and states that:

Each impose upon the electric utility a nondelegable duty to assure minimum safety provisions for all persons without regard to the common law distinctions considered in *Cooper*.

Plaintiff's brief further states:

... The proximate cause of death was violation by the Electric System of various safety regulations and rules. Specifically enumerated and identified by a registered professional engineer (R. 87) as having been violated by the Electric System were OSHA regulations, NESC rules, and American National Standards Institute (ANSI) A.92.2–1979 for Vehicle–Mounted Elevating and Rotating Aerial Devises, Section 4.10.6(1) & (2) and ANSI 2133.1–82, for Tree Care Operations–Pruning, Trimming, Repairing, Maintaining, and Removing Trees and Cutting Brush–Safety Requirements, Section 3.11, 4.1 5.1 & 5.2 (R. 84–86).

... uncontradicted proof before the trial judge about the regulations and rules was unequivocal that an electrical utility in Tennessee "may not delegate to any other person or entity any of its responsibilities for safety concerning the operation or maintenance of the electric system" and has "the sole responsibility for safe operation and maintenance of the system" (R. 84, summarizing various regulations and rules). Thus, "[i]n no case shall the prime contractor be relieved of overall responsibility for compliance with the requirements ... for all work to be performed ..." (R. 85, summarizing various regulations and rules).

It was also uncontested that Line Maintenance Company which was performing work as a subcontractor for the Electric System "was not competent and was negligent for reasons stated in the Complaint with a result that there has been a failure of the operator (Electric System) to fulfill a duty of care to select a competent contractor to perform work related to and attendant to operation of

the system and the performance of such work was negligent". (R. 85–86).

On pages 84, 85 and 86 of the record is found the affidavit of Russell Jackson, a registered professional engineer, presently engaged as a self-employed forensic engineer engaged in equipment failure analysis and testimony (professional investigator-witness). Said affidavit states:

I have examined the initial Complaint filed in the above caption matter, and note that the National Electrical Safety Code, ANSI–C2 has been specifically adopted by Tennessee Code Annotated, Section 68–16–104. Rules 010, 011, 400, 401, 402, and 410.C.1 of the Code (ANSI–C2) taken together define the electric supply company, as a public utility, as having the sole responsibility for safe operation and maintenance of the system. A tree trimming company is not a public utility, and the Code is not directed to such an entity.

. . . .

OSHA Construction Safety Standards published at 29 C.F.R. 1926 were adopted pursuant to the Williams–Steiger Occupational Safety and Health Action of 1970, codified at 29 U.S.C. Sections 655 and 657. The State of Tennessee has opted for enforcements of those standards, the option being available under 29 U.S.C. Section 667. Exercise of the option by the State of Tennessee may be found at Tennessee Code Annotated, Sections 50–3–104, 50–3–201 and 50–3–917. Under those provisions, the Tennessee Commissioner of Labor has adopted and enforces regulations such as those found at 29 C.F.R. 1926. For convenience of reference, it should be noted that Section 1926.16(a) provides as follows:

1926.16 Rules of Construction.—The prime contractor and any subcontractors may make their own arrangements with respect to obligations which might be more appropriately treated on a jobsite basis rather than individually. Thus for example, the prime contractor and his subcontractors may wish to make an express agreement that the prime contractors or one of the subcontractors will provide all required first-aid or toilet facilities, thus relieving the subcontractors from the actual, but not any legal, responsibility (or, as the case may be, relieving the other subcontractors from this responsibility). In no case shall the prime contractor be relieved of overall responsibility for compliance with the requirements of this part for all work to be performed under the contract.

The foregoing indicates that the operator of a system such as Fayetteville Electric System, City of Fayetteville is prohibited from the transfer of responsibility for compliance with the various codes above, such as OSHA codes and the National Electrical Safety Code.

It is also my opinion, after an examination of the above referenced materials, including the Motion for Summary Judgment with attachments, that the contractor performing work for the operator of the system was not competent and was negligent for reasons stated in the Complaint, with a result that there has been a failure of the operator to fulfill a duty of care to select a competent contractor to perform work related to and attendant to operation of the system and the performance of such work was negligent.

No testimony is found on page 87 of the record.

Pages 72–83 of the Record are composed apparently of photostatic copies of parts of the National Electrical Safety Code, but they do not appear to have been authenticated by any affidavit or certified or even to have been filed by the Trial Clerk.

It appears that plaintiff insists that he has shown that *Cooper v. Metropolitan Government,* supra, is inapplicable to this case because a professional forensic engineer testified that he had read the various regulations mentioned in the complaint and that under those regulations a power system has the sole and nondelegable duty of providing safe working conditions for employees of contractors who engage to cut trees and vegetation in the vicinity of power lines and equipment.

■ The content meaning and application of statutes and regulations are not a matter of fact to be proven by the affidavit of an expert witness, but are a matter of law to be presented by brief and argument of counsel supported by citations and authorities.

■ Plaintiff argues that provisions of regulations regarding prime contractors and subcontractors are applicable to this case, but this Court does not agree. A general contractor is one who contracts with the owner of a property to perform a complete schedule of construction or other work, and a subcontractor is one who is engaged by the general contractor to perform a part of the work undertaken by the general contractor. In the present case, the System was not a general contractor. It was the owner who contracted with Carter, the sole contractor to perform tree and vegetation trimming.

Thus the statutes or regulations obligating general contractors to responsibilities for safety are inapplicable to the present case.

■ Plaintiff conceives that tree-cutting is included in the words "maintaining a power system". This Court does not agree. It is true that tree-cutting might be considered "preventative maintenance" in the sense that its purpose is to prevent damage to the system. However, such is not the meaning of the words "maintain" or "maintenance" in the statutes and regulations. For this purpose, maintain means to hold or keep or preserve in an existing state or condition. *Tennessee Electric Power Co. v. White County,* C.C.A.Tenn. 52 F.2d 1065. To "maintain an airport" is to keep it in a state of efficiency for furnishing those facilities and services which air transportation demand. *Concordia Arrow Flying Service Corporation v. City of Concordia,* 131 Kan. 247, 289 P. 955.

This Court conceives a distinction between (1) the design, location, erection and servicing of the components of a power system which conduct dangerous electrical energy and (2) the auxiliary activities which are desirable for the convenience, appearance and preservation of various properties of the system, such as painting buildings, replacing roofs, maintaining lawns and cutting vegetation.

The safety regulations control the activities of the system in constructing, repairing and maintaining the components which conduct electricity, and the system may not avoid liability by delegating such duties to others.

On the other hand, the maintenance or alteration of other properties of the system or of objects in proximity to the system which are not directly involved in the carrying of electrical energy is a matter which may be committed to independent contractors.

These principles being valid, the safety rules and regulations for truck mounted cranes which are not used in repairing or maintaining the energy-carrying apparatus do apply to contractors cutting vegetation under contract with an electrical system, but do not render the contracting system liable for the violation of safety regulations of the tree-trimming contractor.

T.C.A. § 68–16–104, quoted above, undertakes to safeguard persons from the hazards arising from the installation, operation or maintenance of conductors and equipment in electric supply stations and overhead and underground electric supply and communication lines. So long as the installation, operation and maintenance of such conductors, equipment, and lines by the system are in accord with applicable laws and regulations, and the rules of care applicable to the handling of electricity, the system is not liable for the violation of such laws regulations or rules of care by an independent contractor or a stranger.

■ As above quoted, the brief of plaintiff asserts that

It was also uncontested that ... there has been a failure of the operator (Electrical System) to fulfill a duty of care to select a competent contractor ... (R 85–86).

It is true that the affidavit of Russell Jackson, forensic engineer, quoted above, states his opinion from "the above refer-

enced materials" (rules and regulations) that "there has been a failure of the operator to fulfill a duty of care to select a competent contractor ...". As previously pointed out, the affidavit of an engineer is not competent for consideration on a point of law, including interpretation of statutes and regulations, and his conclusory statement as to "failure to fulfill a duty" under the circumstances does not comply with the requirement of T.R.C.P. Rule 56.05 which requires that

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show that the affiant is competent to testify to the matters stated therein.

Other than the affidavit of the forensic engineer, there is no contradiction of the affidavit of the general manager of the System which negatives any negligence in the selection of the contractor.

This Court finds no duty upon an electric system to investigate before selecting as tree-trimming contractors only those contractors whose equipment and methods of operation protect the tree-trimming contractors' employees from the dangers of working in proximity to power lines.

It should be emphasized that this opinion relates only to the liability of the Power System and the City for the death of deceased, and that it has no relation to the liability of other defendants in the case.

The judgment of the Trial Court is affirmed. Costs of this appeal are adjudged against the plaintiff. The cause is remanded for further proceedings.

LEWIS and KOCH, JJ., concur.