IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 19, 2004 Session

## LUKE N. GIBSON, ET AL. v. CHRYSLER CORPORATION, ET AL.

**A Direct Appeal from the Circuit Court for Shelby County**
**No. 302781 T.D.     The Honorable Kay S. Robilio, Judge**

---

**No. W2002-03134-COA-R3-CV - Filed August 26, 2004**

---

This is an appeal from a judgment entered on a jury verdict for Defendant/Appellee. Plaintiff/Appellant, a minor, was allegedly injured when an integrated car seat in a vehicle manufactured and sold by Defendant/Appellee malfunctioned. Plaintiff/Appellant asserts that: (1) the jurors conducted unauthorized experimentation with certain exhibits, which constituted extraneous prejudicial information under Tenn. R. Evid. 606(b); (2) that there is no material evidence on which the jury could have based its verdict; (3) that the trial judge failed to properly perform her duty as thirteenth juror; (4) that the trial court erred in allowing an expert to testify outside the scope of his expertise in violation of *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997); and (5) that the trial court erred, either under Tenn. R. Evid. 702 and 704 or on the theory of judicial estoppel, in excluding a portion of the testimony of a second expert. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

Gail O. Mathes of Memphis; Michael C. Skouteris and George E. Skouteris of Memphis For Appellant, Luke N. Gibson, a minor by parents, Roger O. Gibson and Susan M. Gibson

Lawrence A. Sutter of Cleveland, Ohio; Joy Burns of Franklin, Tennessee For Appellees Chrysler Corporation and Daimlerchrysler Corporation

**OPINION**

On December 16, 1995, Roger and Susan Gibson purchased a 1996 Chrysler Town & Country minivan with a Generation II integrated child safety seat. Roger and Susan Gibson have two children, Luke (together with his parents, the "Gibsons," "Plaintiffs," or "Appellants") and Lisa. On July 3, 1996, Luke was fifteen (15) months old. On that date, Mrs. Gibson drove, with her children, from Memphis, Tennessee to her mother's home just outside Nashville, Tennessee. Returning to

her mother's home, after eating at a restaurant, Mrs. Gibson and her mother tried to removed Luke from the car seat. After Mrs. Gibson pressed the release button of the latch buckle, the child seat allegedly malfunctioned and continued retracting to a point that the T-shield and straps began to constrict Luke's airway. The more Mrs. Gibson tried to pull the straps from Luke's throat and the more Luke struggled, the more the straps and T-shield allegedly tightened against his throat. The Gibsons allege that after minutes of being choked by the child seat, Luke quit crying, changed color, and lost consciousness. At that point, Mrs. Gibson and her mother got back into the van and drove two or three miles to a service station to seek help in removing Luke from the seat.[1] At the service station, a customer saw the commotion and was able to use his pocket knife to pry open the emergency release clips on the seat. Within the next few minutes, Luke allegedly regained consciousness and began moving.

Following the alleged incident, Mrs. Gibson called her husband in Memphis. Luke's father is a physician, practicing in internal medicine. From his wife's account of the incident, Dr. Gibson determined that Luke was not in life threatening danger and that hospital care was not necessary so long at Mrs. Gibson closely observed Luke for any signs of breathing distress. Mrs. Gibson took pictures of Luke's neck and called Chrysler's customer service number to report the incident. After returning to Memphis the following week, Dr. Gibson allegedly observed aspects of Luke's behavior that led him to the conclusion that Luke needed to see his pediatrician. On July 8, 1996, Luke was seen by his pediatrician, Dr. William Threlkeld. Dr. Threlkeld referred Luke to Dr. J.T. Jabbour, a pediatric neurologist, for a neurological examination.

On June 15, 1999, the Gibsons filed a Complaint against Chrysler Corporation, Daimler Chrysler Corporation and Covington Pike Chrysler Plymouth, Inc. (referred to collectively as "Chrysler," "Defendants," or "Appellees"). The Gibsons' Complaint alleges that Luke sustained permanent brain damage as a result of being trapped and choked by the allegedly defective integrated car seat in their 1996 minivan. The Gibsons sought recovery under theories of strict liability, breach of the implied warranties of merchantability and fitness for a particular purpose, and negligence. The Complaint seeks both compensatory damages and punitive damages.[2] On August 13, 1999, Chrysler filed its Answer. Discovery ensued for over two years.

Beginning on February 5, 2002, this case was tried to a jury. During the course of the trial, both sides presented extensive evidence concerning the design, development, testing, and various post-production complaints surrounding the integrated child seat. At the conclusion of the evidence, the jury returned a unanimous verdict in favor of Chrysler. The Gibsons filed a "Motion for Judgment Notwithstanding the Verdict or in the Alternative, for New Trial" on April 19, 2002. An "Amended Motion for Judgment Notwithstanding the Verdict, or in the Alternative, to Renew

---

[1] We note that neither Mrs. Gibson nor her mother went into the house for anything with which to cut the straps, nor did they seek the help of Mrs. Gibson's brother, who was inside the house at the time.

[2] Apparently Plaintiffs' counsel moved orally at or before trial that the Complaint be amended to change the *ad damnum* clause. The trial court entered an Order allowing the amendment on February 27, 2002, raising the *ad damnum* to $538,128,287.00.

Motion for New Trial and Reply" (the "Amended Motion") was filed on October 30, 2002. Pursuant to Tenn. R. App. P. 3(e), the Amended Motion specifically mentions each of the issues raised on appeal. The Amended Motion was denied by Order entered on November 19, 2002.

The Gibsons appeal and raises four (4) issues for review as stated in their brief:

> I. Whether the jury's verdict is supported by material evidence when the jury based its verdict upon the results of unsupervised testing and experimentation of demonstrative evidence that the jury conducted during deliberations?

> II. Whether the jury's verdict that no defect existed is supported by the greater weight of the evidence?

> III. Whether the Court erred in permitting Harvey Cantor, M.D. to provide expert opinions about non-medical engineering issues in violation of the standard set by <u>McDaniel v. CSX Transportation, Inc.</u>, which also exceeded the scope of his Rule 26.02 (4) expert disclosure?

> IV. Whether the Court erred in excluding the testimony of Allan Kam from Plaintiff's case-in-chief?

### I. Whether the jury's verdict is supported by material evidence when the jury based its verdict upon the results of unsupervised testing and experimentation of demonstrative evidence that the jury conducted during deliberations?

As phrased, the Gibsons' first issue appears to be beyond the purview of this Court's review. The Gibsons argue that the only evidence relied upon by the jury was the "unsupervised testing and experimentation performed during deliberations." Appellants' contention is based solely upon the Affidavit of Ms. Boyle, *see infra*, specifically Paragraph seven (7), which reads: "The results of the above referenced experiment by the jurors weighed heavily in our decision not to award a verdict in favor of the Plaintiff." Tenn. R. Evid. 606(b), cited *infra*, specifically states that, upon inquiry into a verdict or indictment, a juror may not testify as to any matter:

> (1) that occurred during the course of deliberations;
> (2) to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict.
> (3) concerning the juror's mental processes.

(4) nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Ms. Boyle's statement in Paragraph seven (7) of her Affidavit is not admissible as it goes to the mental processes of the jury and references the effect of the experimentation and testing on the verdict. Having found that Ms. Boyle's statement concerning the material evidence on which the jurors allegedly based their verdict is inadmissible under Tenn. R. Evid. 606(b), based upon the phrasing of this issue, this Court could move directly into its review of the record to determine whether there is any material evidence on which the jury could have based its verdict.

However, from a reading of Gibsons' brief, it appears that their assignment of error under this issue rests with the jury's performance of their own experimentation with the Gibsons' car seat and the dummies, during deliberations. Consequently, this Court will first address whether Ms. Boyle's Affidavit is admissible under Tenn. R. Evid. 606(b) (i.e. whether the Affidavit evinces "extraneous prejudicial information" improperly brought to the jury's attention, or (2) "outside influence" improperly brought to bear on a juror, or (3) an agreement to be bound by a quotient or gambling verdict). If we find that the Affidavit provides such evidence, then we will evaluate whether such evidence constitutes harmful or harmless error. If harmful, we will remand for new trial. If either the Affidavit is inadmissible under Rule 606(b), or if the evidence the Affidavit provides is harmless, we will then proceed to a material evidence analysis.

As discussed, *supra*, the Gibsons first assert that the material evidence on which the jury based its verdict was the result of the jury's improper experimentation and testing with the Gibson car seat during deliberations. Specifically, the Gibsons contend that this experimentation resulted in "prejudicial and extraneous information [being] gathered during improper, unsupervised experimentation and testing performed by the jury with a doll positioned in the seat." As the basis for their assertion, the Gibsons submitted the "Affidavit of Lucretia Boyle," one of the jurors in the case, as an attachment to their Amended Motion. Ms. Boyle's Affidavit reads, in relevant part, as follows:

> 3. During the jury deliberations, the jurors, myself included, took turns experimenting with the integrated child safety seat from the Gibson van and the doll to determine whether the seat was capable of choking a child.
>
> 4. The jurors performed experiments with the integrated child safety seat while it was positioned in the floor of the jury room and with the seat positioned on the table in the jury room.
>
> 5. Because the width of the doll's neck was much narrower than that of a child, some jurors tried to simulate the width of the child's neck

-4-

by putting either their fingers or their fist between the doll's neck and the straps.

6. The jurors were able to demonstrate that the seat was capable of placing sufficient force on the front of the doll's throat to injure a child but were unable to make the straps dig in on the side.

7. The results of the above referenced experimentation by the jurors weighed heavily in our decision not to award a verdict in favor of the Plaintiff.

A comprehensive statement concerning a jury's conduct of experiments in the process of its deliberations is found in 75B Am.Jur.2d, *Trial*, § 1556:

> A jury may not conduct experiments which have the effect of putting them in possession of evidence not offered at trial. In this regard, experiments of jurors which lead to the jury's consideration of extrinsic evidence are constitutionally impermissible. However, experiments by the jurors as part of their deliberative processes which do not involve the receipt of evidence out of court are permissible, and the conducting of experiments in the jury room which merely duplicate what has occurred during trial in the courtroom, does not constitute reception of new evidence by the jury in this regard. Furthermore, where a test or experiment conducted by the jury in the jury room amounts to a closer, more analytical examination of evidence which was properly introduced at trial, as opposed to the introduction of new evidence, it is not improper.

The rule governing the procedure when the issue of jury misconduct has been raised is well established in Tennessee. Although jurors are permitted to weigh the evidence in light of their own knowledge and experience, their verdict must be based on the evidence introduced at trial. *Caldararo v. Vanderbilt University*, 794 S.W.2d 738 (Tenn. Ct. App. 1990). Clearly, a jury verdict based on something other than the evidence introduced at trial is improper and should not be allowed to stand. However, in order to be granted a new trial due to such jury misconduct, there must be admissible evidence on the issue. Admissibility of evidence from jurors is governed by Tenn. R. Evid. 606(b), which states:

> (b) **Inquiry into Validity of Verdict or Indictment**. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes,

except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The Rule 606(b) analysis provides three exceptions to the rule that jury deliberations are not subject to later scrutiny by the courts: (1) extraneous prejudicial information improperly brought to the jury's attention, (2) outside influence improperly brought to bear on a juror, and (3) an agreement to be bound by a quotient or gambling verdict.

The Gibsons first claim that Ms. Boyle's Affidavit supports a finding that extraneous prejudicial information was improperly brought to the jury's attention as a result of the jury's own experimentation with the dummy and the Gibson car seat. Citing paragraphs three (3) through six (6) of Ms. Boyle's Affidavit, the Gibsons specifically assert that "[i]t was the numerous attempts using an anatomically incorrect doll and/or dummy in recreating the incident originally involving a living, moving baby that accumulated into the new evidence."

Our Supreme Court has held that "extraneous information" is information from a source outside the jury. *State v. Coker*, 746 S.W.2d 167, 171 (Tenn. 1987). Thus, intra-jury pressure or intimidation, *State v. Hailey*, 658 S.W.2d 547, 553 (Tenn. Crim. App. 1983), premature jury deliberations contrary to the trial court's instructions, *State v. Frazier*, 683 S.W.2d 346, 353 (Tenn. Crim. App. 1984), and speculation about a verdict's consequences, *State v. Workman*, 667 S.W.2d 44, 51-52 (Tenn. 1984), have been found to be internal matters that do not involve extraneous information or outside influence.

This Court, in *Caladararo v. Vanderbilt University*, 794 S.W.2d 738 (Tenn. Ct. App. 1990), further discusses the distinction between extrinsic and intrinsic influence, to wit:

> Like our federal counterparts, Tennessee's courts now recognize a distinction between extrinsic and intrinsic influence when reviewing a motion for new trial based on alleged juror misconduct. External influences that could warrant a new trial if found to be prejudicial include: (1) exposure to news items about the trial, (2) consideration of facts not admitted in evidence, and (3) communications with non-jurors about the case. *Government of Virgin Islands v. Gereau*, 523 F.2d at 149-50; *United States v. Blackston*, 547 F.Supp. at 1217. Internal influences that are not grounds to overturn a verdict include: (1) discussions among jurors, (2) intimidation or harassment of one juror by another, (3) a juror's personal experiences not directly related

to the litigation, and (4) a juror's subjective thoughts, fears, and emotions. *United States v. Norton*, 867 F.2d 1354, 1366 (11th Cir.1989); *United States v. Krall*, 835 F.2d 711, 716 (8th Cir.1987); *Carson v. Polley*, 689 F.2d 562, 581 (Former 5th Cir.1982); *United States v. Duzac*, 622 F.2d 911, 913 (5th Cir.1980).

*Id.* at 742.

The Gibsons contend that the jury's experimentation amounted to new evidence and was external to the proceedings because the jury's reliance upon the results of their own testing constituted consideration of facts not admitted into evidence. We disagree. It is undisputed that both the Gibson car seat (Plaintiffs' Exhibit 3), an exemplar car seat (Defendants' Exhibit L), and two anthropometric dummies, a three year old hybrid II dummy (Defendants' Exhibit M) and a fourteen-month-old female dummy called Princess (Defendants' Exhibit N), were admitted into evidence without objection by either party, to wit:

> MR. BODE [attorney for Defendant]: Your Honor, at this time, in order to clear up any problems with the Exhibits, I'm going to offer L, M, N...into evidence based on the testimony of Dr. Stalnaker.
>
> *                                   *                                   *
>
> THE COURT: All right. Any objection?
>
> MR. SMITH [attorney for Plaintiff]: No objection.

It is also undisputed that the trial court allowed the car seats and dummies to be taken into the jury room during deliberations without objection from either party. In short, both the car seat (i.e. the Gibson car seat) and the dummy (i.e. Princess), on which the jury experimented, were intrinsic to the trial. Chrysler urges us to stop our analysis here, reasoning that Plaintiffs' failure to object to the admission of this evidence at trial, or to its submission to the jury, constitutes a waiver of their opportunity to challenge the jury's use of same. We disagree. Even though the evidence itself is intrinsic to the trial, we nonetheless concede that, through their experimentation, the jury could have adduced evidence that was not intrinsic to the trial. On this note, the Gibsons contend that the jury created new/extrinsic evidence, by virtue of their experimentation, for three reasons: (1) the doll "was significantly different from the injured child," (2) "by the number of times the jury experimented," and (3) "by the use of various and inappropriate techniques."

We now turn to each of these assertions to determine whether the doll's anatomy, the number of times the jury experimented, and/or the techniques employed by the jury constituted any additional evidence that was not gleaned at trial.

The Doll's Anatomy

The record indicates that "all exhibits including Exhibit 1 went back to the jury...." From Ms. Boyle's Affidavit it is not clear which of the two dummies admitted at trial was used in the jury's experiments, since Ms. Boyle refers to the exhibit only as "the doll," and not by name (i.e. Princess) or by exhibit number. However, in paragraph five (5) of the Affidavit, Ms. Boyle indicates that "the width of the doll's neck was much narrower than that of a child," which leads to the conclusion that the experimentation was performed with the doll Princess (Defendant's Exhibit N).[3]

Chrysler used the testimony of Dr. Richard Stalnaker to lay the foundation for the dolls' admission into evidence. Dr. Stalnaker made the following, relevant statements about Princess' anatomy and whether the doll was representative of a child Luke Gibson's age:

> Q [by Defendant's counsel]: There's been some contention in this case that Princess is inadequate, Exhibit N, because of her neck size. Does the aspect that you [Dr. Stalnaker] just demonstrated, does it have any relationship to neck size of the anthropometric device?
>
> A [by Dr. Stalnaker]: It has a little bit. Her neck size is smaller by about an inch than what her size would have been if she was a fourteen-month-old child. They made it a little thinner because I guess they wanted it to look like, more or less, a much thinner child.

Despite the doll's admittedly thinner neck, Plaintiffs' attorney failed to object when the doll was moved into evidence. Likewise, there was no objection when Defendants' Exhibit M, the three-year-old dummy, with enlarged neck, was admitted into evidence.

The foundation evidence, however, is not the only evidence in record concerning the dolls' dissimilarity to Luke Gibson, or any other fourteen-month-old. Numerous witnesses made reference to the fact that the dummy is not the same as a child. For example, in his testimony, Mr. Tony

---

[3] Dr. Stalnaker testified as follows concerning the neck of the three-year-old dummy, Defendant's Exhibit M:

> Q. The neck on the Exhibit M, dummy, is significantly larger than the neck on a fourteen-month-old?
>
> A. Yes. It's also larger than what's on a three-year-old. This doesn't represent the diameter of an actual three-year-old. The actual three-year-old neck is shown below that padding....
>
> This padding was put on here because of an air bag. An air bag will wrap around the neck of the dummy and grab a hold of his chin and cause the forces to be high. And our neck is more blended together and more soft and kind of mushy. So they actually put this extended collar on here to cause an interface between the chin and around the dummy to do the air bag testing....

Brenders made the statement "No doubt the dummy is different than a child." Mrs. Gibson, while experimenting with the car seat and dummy in open court, stated "...that doll has a head about half a size or fourth the size of his [Luke Gibson's]." There are numerous other examples in the record but, without listing them all here, suffice it to say that the fact of the dolls' shortcomings as anatomically identical to Luke Gibson, or other children his age, was adduced during the trial. Consequently, the fact of the dolls' anatomical differences was not new evidence derived by the jury from their experimentation during deliberations.

Number of Times the Jury Experimented

At trial, the Gibsons' attorney stressed the point that the choking incident at issue in this case was "a one-time aberration that [could not] be replicated through a live experiment," and that "Mrs. Gibson used the [seat] hundreds of times before it [the alleged choking of Luke Gibson] happened...," to wit:

> Q [By Mr. Smith, attorney for Plaintiff]. I'm going to ask you [Mrs. Gibson] a question and I know you can't answer it accurately but I want you to take your best shot. In the six months that you had owned this car when this incident happened. About how many times do you think you had put Luke in and out of that seat?
>
> A [By Mrs. Gibson] ...probably once or twice a day.
>
> Q. Six months is 180 days. So we're talking 200 to 350 times, rough estimate; correct?
>
> A. Correct.
>
> Q. Had there ever been a single incident of him [Luke] being where you could not get him out?
>
> A. No...
>
> *       *       *
>
> Q. But it did happen on that day, didn't it?
>
> A. Yes.

From our reading of the record, it appears that the Gibsons' stance is that the alleged malfunction of the car seat can not be replicated in a single re-enactment but requires long-term use of the chair (i.e. the seat's alleged malfunction is unpredictable). Yet, despite their position, the Gibsons' attorney did not object when Chrysler's attorney cross-examined numerous witnesses by asking them to perform re-enactments and/or experiments with the car seats admitted into evidence.

Consequently, the record in this case is replete with evidence of attorneys and witnesses manipulating the car seats, in some cases several times over the course of their testimony and in some cases only once. Ms. Boyle's Affidavit does not indicate exactly how many different experiments the jurors performed, or how many times they repeated the same experiment. Based on the Affidavit, and the evidence adduced at trial, we do not find that the number of repetitions or various manipulations performed by the jurors on the car seat constitutes new/extrinsic evidence.

Techniques

Finally, the Gibsons assert that the jury employed "various and inappropriate" techniques in their experimentation, which resulted in new evidence. The only techniques described by Ms. Boyle in her Affidavit were that the jury performed their experiments while the child seat was positioned on the floor and on the table, and that they experimented by "putting either their fingers or their fist between the doll's neck and the straps." We will evaluate both of these techniques to determine whether either constitutes evidence extrinsic to the trial. From the record, it is not clear where the child seats were positioned (i.e. on the floor of the courtroom or on a table) during the various tests, re-enactments, and experiments performed in court. What we do know is that neither the exemplar seat nor the Gibson car seat was integrated into a vehicle during trial. The seats were delivered to the jury room in this same state. There is no evidence to suggest that the jurors did anything to the car seat to change its form (e.g. they did not try to take it apart, they did not try to integrate it into a vehicle, they did not cut its straps). The mere positioning of the car seat from one surface to another, without more, does not constitute new evidence.

Concerning the jury's manipulation of the doll's neck, we turn to the record to evaluate the various types of experiments, tests, and re-enactments that were performed in front of, or viewed by, the jury. The record shows, *inter alia*, that experiments were performed with the doll inside the seat and with the doll not in the seat, with the doll still and with the doll being moved to simulate an actual child. Videotaped depositions, that were played in court, show demonstrations on the car seats, using anything from a large, stuffed bear, to an attorney's arm, to an actual child. In light of all of these various techniques that were present at trial, we cannot say that the jury's attempt to expand the dummy's neck was so different from the evidence adduced at trial as to constitute new evidence.

The Gibsons also assert that "Chrysler's attorney went beyond his role as an advocate and exerted influence [on] the jury that was outside influence." As grounds for their assertion, the Gibsons cite the following from Chrysler's opening statement:

> Mr. Bode: [attorney for Chrysler] However, I'm going to submit to you that in this case there are several witnesses, not in the traditional sense of a human being talking from a witness stand and answering lawyers' questions. But there is this seat– it's a witness. I believe the evidence will be that it hasn't been altered at all since July 3, 1996 and nobody has changed anything with regard to this child seat.

The Gibsons also cite the following from Chrysler's closing statement:

> Mr. Bode: ...But we did represent to you that Princess was *pretty close* to what should be the seated height of Luke Gibson. The seated height is the critical element in determining a situation like this, and that she's in evidence for you. The seat's in evidence for you. ***That seat's in evidence for you. Dummy's in evidence for you to use to prove us wrong. <u>If you can create a choking situation, then you've proved us wrong</u>***.

(emphasis provided by Appellant).

We first note that Ms. Boyle's Affidavit gives no indication that Chrysler's attorney's statements had any bearing on the jury's deliberations.[4] That fact alone removes the statements of Chrysler's attorney from analysis under Rule 606(b). However, even if we allow the argument advanced by the Gibsons in their brief, we nonetheless find that any statements made by counsel at trial do not constitute "outside influence" as contemplated by Rule 606(b). Rather, the offending statements were heard by the jury during trial, which makes them intrinsic to the proceedings and thereby not an "outside influence." We note that the Gibsons' attorney made no objection to Chrysler's attorney's arguments. Having failed to take advantage of that opportunity at the trial level, the Gibsons cannot be heard to complain on appeal.

For the foregoing reasons, we find that Ms. Boyle's Affidavit is not admissible under Tenn. R. Evid. 606(b). We now turn to the question of whether there is any material evidence in the record on which the jury could have based its verdict.

Our review of the judgment entered on the jury's verdict is governed by Tenn. R. App. P. 13(d), which provides that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Under this standard of review, we "are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict." ***Crabtree Masonry Co. v. C & R Constr., Inc***., 575 S.W.2d 4, 5 (Tenn.1978). In making this determination, we are "required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary." ***Id.*** If the record contains any material evidence to support the verdict, we must affirm the trial court's judgment. ***See id.***; ***accord Forrester v. Stockstill***, 869 S.W.2d 328, 329 (Tenn.1994).

The jury's verdict, as read into the record by the foreman, is as follows:

---

[4] We note that, even if Ms. Boyle's Affidavit had reference the jury's reliance upon Chrysler's attorney's statements and/or any effect that these statements may have had on the jury's verdict, under Tenn. R. Evid. 606(b), these statements would not have been admissible, *see* discussion under first issue, *supra*.

-11-

JURY FOREMAN: Number one, "Do you find the defendant DaimlerChrysler to be at fault due to strict liability?" We marked no.

Number two, "Do you find the defendant DaimlerChrysler to be at fault due to breach of implied warranty?" We voted no.

In three, "Do you find the defendant DaimlerChrysler to be at fault due to breach of express warranty?" We voted no.

Four, "Do you find the defendant DaimlerChrysler to be at fault due to negligence?" We voted no.

THE COURT: All right. This was a unanimous verdict.

JURY FOREMAN: Yes.

Under the provisions of the Tennessee Products Liability Act of 1978, T.C.A. §§ 29-28-101 to 108, a manufacturer or seller of a product may be held liable for an injury caused by its product only if the "product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." T.C.A. § 29-28-105. A defect may be proven by direct evidence, circumstantial evidence, or a combination of both. *Browder v. Pettigrew*, 541 S.W.2d 402, 405 (Tenn. 1976). The mere occurrence of an accident is not sufficient to prove a defect. *Browder* at 406. In essence, the plaintiff must prove that "something was wrong" with the product. *Tatum v. Cordis Corp.*, 758 F. Supp. 457, 461 (M.D. Tenn. 1991). While circumstantial evidence such as proof of proper use, handling or operation of the product may be enough to satisfy the requirement, a defective condition can be proven by the testimony of an expert who has examined the product or who offers an opinion on the product's design. *Browder* at 406 (quoting *Scanlon v. General Motors Corp.*, 326 A.2d 673 (1974)). In Tennessee, the general rule is that "the issue of whether a product is defective or unreasonably dangerous is one for the jury." *Curtis v. Universal Match Corp.*, 778 F.Supp. 1421, 1427 (E.D. Tenn. 1991).

The Gibsons assert that the jury's verdict "could not have resulted from a proper consideration of the evidence presented at trial...because Chrysler **admitted** the presence of a defect [in the car seat]." The Gibsons point, *inter alia*, to Trial Exhibit Seven (7), a "Safety Recall to Install Extensions on Your Vehicle's Integrated Child Seat Belts," issued by Chrysler to owners of 1996 and 1997 vehicles with integrated child seats (the "Recall Notice"). The Recall Notice reads, in relevant part, as follows:

> Chrysler Corporation has determined that a defect which relates to motor vehicle safety exists in some 1996 and 1997 [Chrysler vehicles with integrated child seats].

*The problem is...*        **Debris in the latch plate area of the integrated child seats on your minivan...may cause the belt retractor to remain locked when the buckle is unlatched. A locked retractor could make it difficult to remove a child from the seat.**

\*                         \*                         \*

...If your dealer fails or is unable to remedy this defect...

(Emphasis in original).

With Chrysler admitting to a "defective condition" in the car seat, the Gibsons reason that the jury had no choice but to find Chrysler liable under the Tennessee Products Liability Act. We disagree. It is true that Chrysler admits to a defect in the latch plate on the seat, especially when debris such as food crumbs come into contact with that mechanism. However, the record is replete with material evidence on which the jury could have concluded that the admitted defect was not the cause in fact of Luke Gibson's alleged injuries (i.e. despite the admitted fact that the latching mechanism could become jammed, the retractor mechanism was not capable of generating enough force to choke a child). Without reproducing all such evidence in this rather extensive record, we reproduce the following two pieces of evidence on which the jury could have based its conclusion that the car seat was neither defective nor unreasonably dangerous. Sue Cischke, a former Chrysler engineer with twenty-five years of experience and the former Executive Director of Vehicle Certification Compliance Safety Affairs, testified, in relevant part, as follows:

Q. In this situation involving the integrated child seats, you're aware of those customer complaints where children were being quote choked unquote by the car seat; are you not?

A. Yes, I'm aware of that.

Q. Was that an issue that was addressed promptly by the vehicle safety office?

A. Yes. Just because it involved a child safety seat and involved, you know, children we took it very seriously.

Q. Tell the jury exactly how that issue was resolved in your mind personally and in the mind of anyone else?

A. One of the concerns that had been expressed was could the seat choke anybody. So we wanted to evaluate that. And we took a seat

and we put a dummy the size of a child in that seat and we looked if there was any way that the mechanism when it locked up could choke anybody. And we demonstrated to ourselves and NHTSA that that wasn't possible. That when the belts were retracted and as we pushed up the T-shield it was not retracting because there was really no force there and there was no way to get that up to a point where it could choke or injure a child in that way. So we demonstrated that not only to me and my group but we took that to NHTSA and we showed them as well. I remember being with Kathy Demeter, who is the director of the Office of Defect Investigation. We had the dummy, we had her try it, we had a number of people try and position that and we were not able to get this belt in any position that was like that.

In addition, Dr. Richard Stalnaker, a biomechanical engineer with experience in child seat design, also testified that the child seat was incapable of inflicting a choking-type injury, to wit:

Q. Now, there's been a contention in this case that somehow the belts pinch in onto the carotid arteries of Luke Gibson. Is there anything in this system whereby such force could be generated? And again, I'll leave it open to microwaves, cosmic rays, anything that can cause these belts to come in and provide lateral pressure on the side of the neck?

A. I'm not going to get into what forces it takes to do it. But from a geometric point of view, just from geometry, if I pull this out, how do I get this belt that's being held apart by these locations, how do I get it to go sideways?

The only way I can get this belt into that child's neck is to go like this (demonstrating). The only way–and I can't get it to go in both of them at the same time because if we look at–I mean, I think we can agree that this dummy is bigger and wider than a fourteen-month-old baby, as we've talked about earlier.

And the distance between the shoulder belt in the back and the shoulder belt on this side is it's in the groove. It's in the slot. You can't pull in any closer than that because it stops it. And that slot is designed to go over the dummy's shoulder because this is what the dummy's designed for. And there's no way that I can figure out from the geometry point of view that I can get this belt, pull it out, and get it to go into the child's neck some way and do that.

> I mean, this belt can't do it. I know it. I mean, there is no way I can think of that you can get these belts to go sideways and pinch this child's neck. Even if I pulled this thing all the way down to the bottom, the shield keeps it apart in the front. The slots keep it apart in the back. So if this child stays in the seat where he's supposed to in here, you're not pulling him out one way or the other. This thing cannot attack him. It can't. It's designed not to.

The Gibsons allege that "the record is replete with contradictions and irreconcilable conflicts in the testimony of Chrysler's witnesses on material issues in this case." In short, the Gibsons assert that, since Chrysler's witnesses, "when viewed together, contradicted each other [, the witnesses are] simply not credible." We disagree. It is well settled in Tennessee that, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trier of fact, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier or fact, and the credibility accorded will be given great weight by the appellate court. *See id*.; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). In short, it is not the job of this Court "to weigh the evidence or to decide where the preponderance lies, but [we] are limited to determining whether there is material evidence to support the verdict." *Crabtree Masonry Co. v. C & R Constr., Inc*., 575 S.W.2d 4, 5 (Tenn.1978). Based on the foregoing, we find that there is credible, material evidence on which this jury could have based its decision.

## II. Whether the jury's verdict that no defect existed is supported by the greater weight of the evidence?

As discussed, *supra,* it is not the job of this Court to weigh the evidence, to determine where the preponderance lies, or to decide the credibility of witnesses. Although Appellants devote much of their brief to outlining the discrepancies and inconsistencies in the Chrysler witnesses' testimony and cite opposing testimony from their own witnesses, this Court is limited to a determination of whether there is any credible, material evidence on which the jury could have based its verdict, which we discuss in the proceeding section. In addition to inviting this Court to weigh the evidence, which we decline to do for the foregoing reasons, the Gibsons also assign error to the trial court's denial of their Motion for New Trial for failure to properly perform its function as thirteenth juror.

When the trial court is called upon to act as the thirteenth juror upon the filing of a motion for a new trial, the trial court must be independently satisfied with the verdict of the jury. *Cumberland Tel. and Tel. Co. v. Smithwick*, 112 Tenn. 463, 79 S.W. 803 (Tenn.1904). The Supreme Court's opinion reads in part:

> The rule in civil cases is that, if the circuit judge is dissatisfied with the verdict of the jury, it is his duty to set it aside and grant a

new trial, and that upon its being made to appear to this court, from statements made by the circuit judge in passing upon the motion for new trial, that he was really not satisfied with the verdict, it becomes the duty of this court, when it has acquired jurisdiction of the cause, to do what the circuit judge should have done; that is, to grant a new trial on the ground of the dissatisfaction of that judicial officer with the verdict. [Citations omitted.]

\*                                          \*                                          \*

The reasons given for the rule are, in substance, that the circuit judge hears the testimony, just as the jury does, sees the witnesses, and observes their demeanor upon the witness stand; that, by his training and experience in the weighing of testimony, and the application of legal rules thereto, he is especially qualified for the correction of any errors into which the jury by inexperience may have fallen, whereby they have failed, in their verdict, to reach the justice and right of the case, under the testimony and the charge of the court; that, in our system, this is one of the functions the circuit judge possesses and should exercise--as it were, that of a thirteenth juror. So it is said that he must be satisfied, as well as the jury; that it is his duty to weigh the evidence, and, if he is dissatisfied with the verdict of the jury, he should set it aside....

*Id*. at 804-05.

If the trial judge, when acting as the thirteenth juror, simply approves the verdict without any comment, it is presumed by an appellate court that he or she has performed his or her function adequately. ***Miller v. Doe***, 873 S.W.2d 346 (Tenn. Ct. App.1993). Where the trial court makes comments in the course of reviewing a motion for a new trial, we will review those comments, but we do not review those comments to see if we agree with the trial court's reasoning but rather to determine whether the trial court properly reviewed the evidence and was satisfied or dissatisfied with the verdict. *Id.* at 347. If the trial judge makes comments which indicate that he or she has misconceived his or her duty or clearly has not followed it, this Court must reverse and remand the case for a new trial. *Id*.

The Gibsons' Motion for New Trial was heard by the trial court on November 7, 2002. There is no transcript of this hearing in the record. The Motion for New Trial was denied by Order of November 19, 2002. This Order simply denies the Motion for New Trial without explanation. Since there are no comments in this record, concerning the trial court's review of the Motion for New Trial, we must presume that the trial court performed its function adequately. ***Miller v. Doe***, 873 S.W.2d 346 (Tenn. Ct. App. 1993).

### III.  Whether the Court erred in permitting Harvey Cantor, M.D.

**to provide expert opinions about non-medical engineering
issues in violation of the standard set by <u>McDaniel v. CSX Transportation, Inc.</u>,
which also exceeded the scope of his Rule 26.02 (4) expert disclosure?**

In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. ***McDaniel v. CSX Transportation, Inc.***, 955 S.W.2d 257, 263-264 (Tenn. 1997). To assist the trier of fact in this "gatekeeping" function, Tennessee Rule of Evidence 702 permits an expert to testify "in the form of an opinion or otherwise," only where the "scientific, technical, or other specialized knowledge" offered by the witness will substantially assist the trier of fact. Tenn. R. Evid. 702. Tennessee Rule of Evidence 703 requires an expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Tenn. R. Evid. 703. The determinative factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." ***State v. Stevens***, 78 S.W.3d 817, 834 (Tenn. 2002). A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or is abused. ***Id***. at 832.

The Gibsons assert that Chrysler's expert in pediatric neurology, Dr. Harvey Cantor, was erroneously allowed, over their objection, to exceed the limitations of his qualifications as a pediatric neurologist and to opine, without an engineering background, that the child seat was not capable of occluding the carotid artery of Luke Gibson. In their brief, the Gibsons cite the following portions of Dr. Cantor's testimony as evidence that he was testifying from an engineering, as opposed to a medical, standpoint:

> Q. [by Mr. Bode, attorney for Chrysler] I want to get Princess in the seat. Tell the jury what your medical opinion is as to whether or not this child seat can occlude carotid arteries of a child under any circumstances?
>
> A. [by Dr. Cantor] Any circumstances?
>
> Q. Yes, any circumstance?
>
> A. Well, that would be ridiculous circumstances. I mean, if somebody took one of these straps off and wrapped it around the neck and twisted it or suspended the child by the neck in that manner, yes.
>
> *             *             *
>
> Q. Have you been able to determine any way that the straps can pinch in on the neck of the child from this seat?

-17-

A. No. No, I have not and I have tried vigorously and I have not been able to see in what way this could have happened.

Appellants have lifted these two section of offending testimony from the whole of Dr. Cantor's rather lengthy testimony. In the interest of fairness, we quote more extensively from the record in order to place the offending testimony in its proper context:

Q. [by Mr. Bode, attorney for Chrysler] Now, there has been some contention in this case that the child suffered occlusion of the carotid arteries, and I am going to take you back to your early testimony where you referenced the carotid arteries. Do you remember that?

A. [by Dr. Cantor] Yes, sir, I do.

Q. I want to get Princess in the seat. Tell the jury what your medical opinion is as to whether or not this child seat can occlude carotid arteries of a child under any circumstances?

A. Any circumstances?

Q. Yes, any circumstance?

A. Well, that would be ridiculous circumstances. I mean, if somebody took one of these straps off and wrapped it around the neck and twisted it or suspended the child by the neck in that manner, yes.

Q. Where are the corotids, just, you know, showing, you know, basically on Princess where the carotids are?

A. The carotids are here and here deep.

Q. Okay.

A. Alongside but back from the trachea.

Q. Okay. Are they–when you use the term in anatomy "mobile", what does that mean?

A. They are movable. For those of us in the old days we had to put needles in the carotid arteries so we could take pictures of the brain. For those of us who were not terribly adept at that, that was always very scary, and it was for even for people who were adept, because the arteries can move. It's very hard to hold them firmly and

-18-

compress them and put the needle. It's a difficult, technically difficult procedure.

Q. We have seen a picture of a mark on the right side of Luke Gibson's cheek and neck. Have you seen that picture?

A. Yes, sir, I have.

Q. Does that picture show anything that would indicate a threat to the carotid artery?

A. No. It's over the jawbone, so–and it starts inferior to the ear just this much and it's this way, and depending in some way what made that mark. If it was a string that was under like this and came up like that on the child, it could conceivably. Then when the string was removed, it was pulled and abraded the skin, it would be within the realm of–even then, I don't think it would be possible.

But unless it went around the neck and was doing this or choking. But a string could do that sort of thing.

The jawbone itself would protect the carotid artery which is underneath it, if that was a hard item like the superior portion, the top portion of this chest play the, the shield.

Q. You have examined this seat in detail, haven't you, Doctor?

A. I don't know what the word "detail" means in that sentence, but I have had the chance to examine the seat with this child in it. I don't know–and with this doll, rather, and with that other manikin, child.

Q. Dummy.

A. Dummy.

Q. It's a test dummy is what he is.

A. Test dummy in the chair.

Q. Have you been able to determine any way that the straps can pinch in on the neck of the child from this seat?

A. No. No, I have not and I have tried vigorously and I have not been able to see in what way this could have happened.

Q. Thank you, Doctor. Doctor, have you formed an opinion to a reasonable degree of medical certainty as to whether or not the incident of July 3, 1996 caused Luke any anoxic or hypoxic brain injury?

A. Yes, sir, I have.

Q. Is that opinion based on your knowledge, training, and experience?

A. Yes, sir, it is.

Q. What else is it based on? Is it based on the review of the reports?

A. It's based on the information regarding this child.

Q. Okay. And what is your opinion with regard to the incident of July 3, 1996?

A. As I have indicated on several occasions, that that incident could not have caused, the way it was described and what happened, hypoxia, diminished oxygen to the brain, or you left out ischemia, occlusion of the carotid arteries.

When his testimony is read in its proper context, it is clear that Dr. Cantor is not testifying from an engineering standpoint. Rather, Dr. Cantor's testimony constitutes a medical opinion about the location of the arteries, the mobility of the arteries and whether the straps on the seat were positioned so as to physically reach the arteries. As a medical expert, Dr. Cantor was within his field of expertise in testifying that the straps could not occlude Luke Gibson's arteries because those straps were not physically capable of reaching the location of the arteries, or because the arteries are "mobile". Consequently, we do not find that the trial court abused its discretion in allowing Dr. Cantor to testify along these lines.

### IV. Whether the Court erred in excluding the testimony of Allan Kam from Plaintiff's case-in-chief?

The Gibsons proffered Mr. Allan Kam, an attorney who had previously been employed by the National Highway Traffic Safety Administration ("NHTSA"),[5] to offer his opinions relative to the alleged tardiness of Chrysler's recall on the subject child safety seat. In the days before trial began, both sides filed Motions *in Limine* with the trial court to exclude and limit certain evidence and testimony. Among these motions, Chrysler moved to exclude the testimony of Mr. Kam on the basis that his opinions would deprive the court and the trier of fact of their duties by testifying on the ultimate issue. The trial court held ruling in abeyance until after an evidentiary hearing could be conducted. At that hearing, the trial court ruled that, although Mr. Kam could testify, he could not render an opinion as to whether Chrysler was late in issuing its recall. The trial court reasoned as follows:

> THE COURT: Just a second. Mr. Smith and Counselors–I am still not convinced. I think if you make the argument that I think everything that Mr. Kam wants to testify to historically laying the historical foundation, what occurred, how it occurred, what he reviewed, what it revealed, attacking the credibility of the–what you were calling to the Court's attention in the Chrysler witnesses whose depositions you read from. All that can come in.
>
> When it comes to his [Mr. Kam's] saying that Chrysler should have conducted its recall earlier, you can make that argument yourself as well as Mr. Kam, or whoever does the closing argument. You are free to make that, but I'm not going to allow Mr. Kam to make that call.
>
> MR. SMITH: [counsel for the Gibsons] Well–
>
> THE COURT: Note your objection.
>
> MR. SMITH: I shall.
>
> THE COURT: So we can get on with this trial.
>
> MR. SMITH: If, Your Honor, and I certainly intend to honor Your Honor's ruling and not reargue it–

---

[5] NHTSA is the federal regulatory agency that has the authority, pursuant to federal statute, to order the recall of products that contain safety defects. One of NHTSA's functions is to monitor the recalls and to make sure they occur in a timely fashion. NHTSA is also authorized by federal law to impose civil penalties on a manufacturer who has delayed recall. 49 U.S.C. §30165.

THE COURT: I don't expect you to agree with me, Mr. Smith. But this is my call, and my call is you can make the argument as well as Mr. Kam can.

As discussed, *supra*, the admissibility of expert opinion testimony is a matter which rests within the sound discretion of the trial court. **McDaniel**, 955 S.W.2d at 562. Accordingly, we may reverse the trial court's ruling in this regard only if the trial court's discretion is arbitrarily exercised or abused. **Id**. at 263.

Unlike its federal counterpart, Tennessee Rule of Evidence 704 allows experts to testify on an ultimate issue to be decided by the trier of fact. However, the expansiveness of Tenn. R. Evid. 704 does not mean that all expert opinions regarding ultimate issues are admissible; opinions that embody legal conclusions as to ultimate issues are not admissible as this would invade the province of the court and/or jury. **Coffey v. City of Knowxville**, 866 S.W.2d 516 (Tenn. 1993) (citing **United States v. Scop**, 846 F.2d 135 (2nd Cir. 1988); Cohen, Paine & Sheppard, Tennessee Law of Evidence, 2d ed., pp. 364-366 (1990)). The Advisory Committee's Note to Rule 704 of the Federal Rules of Evidence, upon which the Tennessee Rules are based, is helpful in understanding the limitation on the admission of opinion testimony:

> The abolition of the ultimate issue rule does not lower the bar so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day....

Fed. R. Evid. 704 advisory committee's note (2003).

In **Dempsey v. Correct Mfg. Corp**., 755 S.W.2d 798 (Tenn. Ct. App. 1988), this Court held that "[t]he content meaning and application of statutes and regulations are not a matter of fact to be proven by the affidavit of an expert witness, but are a matter of law to be presented by brief and argument of counsel supported by citations and authorities." **Id**. at 806. The Gibsons assert that Mr. Kam's proposed testimony would not have implicated any statute or regulation but would have laid the factual predicate that "would allow the jury 'to understand the evidence or determine a fact in issue,' i.e. whether Chrysler had knowledge of the defect, which would ultimately 'substantially assist the trier of fact to determine' whether Chrysler was negligent in not conducting its recall at an earlier time." From our review of the record, it appears that, had Mr. Kam been allowed to testify

that Chrysler should have issued its recall earlier, he would in essence be opining that Chrysler violated certain federal statutes and/or certain NHTSA regulations.[6]

It is undisputed in this case that NHTSA became involved in the investigation of the integrated child seats in the summer of 1996 and remained involved until Chrysler issued its recall in July of 1998. NHTSA never demanded that Chrysler issue a recall; instead, NHTSA allowed Chrysler to try other remedial action such as the service campaign in the summer of 1997. After Chrysler issued its recall in 1998, NHTSA closed its file and did not pursue any penalty or sanction against Chrysler concerning the recall. Furthermore, attorneys for both sides represented to the trial court that the NHTSA regulations were not at issue in the case, to wit:

> THE COURT: ...Mr. Smith [counsel for the Gibsons], are you[r] proposed jury instructions including any NHTSA regulations?
>
> MR. SMITH: No.
>
> THE COURT: No?
>
> MR. SMITH: It's not going to include NHTSA regulations. The only way the NHTSA regulations are going to come into play is through Mr. Kam's testimony, so we're not going to charge the jury on those laws.
>
> THE COURT: That's very difficult, Mr. Smith.
>
> MR. SMITH: It's a different issue. It's not–
>
> THE COURT: I don't have any problem with his [Mr. Kam's]–so far with his testimony insofar as where he's laying the groundwork for attacking credibility, but if he gets into NHTSA regulations and saying there is a violation of them, and that law doesn't come from the Court.... If the NHTSA regulations are not in a–in the proposed jury instructions, I don't see how we–
>
> MR. SMITH: I don't have a problem putting them [the NHTSA regulations] in. It's fine with me to put them in. He [Mr. Kam] is certainly going to opine that that recall should have been done earlier....
>
> *           *           *

---

[6] Specifically, 49 U.S.C. §§30118(c)(1), 30119, 30120 and Title 49 C.F.R. Parts 573 and 577.

THE COURT [to Mr. Smith, counsel for the Gibsons]: ...[I]n your closing argument–you're going to argue that they [Chrysler] should have conducted this recall much earlier and they had the information and that they should have conducted the recall earlier–in your closing?

MR. SMITH: Absolutely.

THE COURT: Mr. Bode [counsel for Chrysler], how are you going to handle that?

MR. BODE: I believe, Your Honor, my argument would be that we were trying to do everything we could to sort out the problem; that–

THE COURT: But you are not going to reference the NHTSA regulations?

MR. BODE: No.  I'm not going to reference the Safety Act.

THE COURT: Okay.

MR. BODE: I may reference the NHTSA documents that Mr. Kam is going to that I believe can be read to say the agency and Chrysler were working together to try to solve this problem and that they were taking successive steps–

THE COURT: Yeah.

MR. BODE: And that the agency–

THE COURT: As long as you don't get into NHTSA regulations and the violations thereof.

MR. BODE: I won't get into regulations for the United States Code in my final argument.

THE COURT: All right.

MR. SMITH: Or their compliance or failure to comply with those regulations.

MR. BODE: Well–

-24-

MR. SMITH: Because if I–you know, we have got a witness here who we contend is capable of addressing that, and it's probably going to be apparent to the jury. And it may–

THE COURT: Again, when he gets his opportunity to present his case, if he starts going into that, then you have–I'm not precluding–let's be clear for the record for the Appellate Court to understand that this Court is not saying that at some point in time Mr. Kam's testimony about the time of when Chrysler conducted its recall, might not be appropriate on rebuttal. I have said that, you know, that's a possibility. I don't know, and you don't know at this point what the proof is going to be when Chrysler gets its opportunity to go forward. But, assuming that Chrysler doesn't visit these violations or regulations or non–or compliance with regulations, then you wouldn't have any need to go into it.

It is undisputed that Mr. Kam had no involvement with the NHTSA investigation of the integrated child seat. As noted, *supra*, to allow Mr. Kam to testify regarding whether Chrysler should have conducted its recall earlier, would be paramount to allowing him to testify that Chrysler had breached the NHTSA regulations. It is conceded that the NHTSA regulations were not at issue in this case. However, even if the regulations were at issue, it is clear from the record that Mr. Kam was not qualified to render an opinion as to whether Chrysler violated any NHTSA regulation. That decision was within the purview of NHTSA. NHTSA's decision not to pursue sanctions against Chrysler following its recall indicates that the agency was satisfied that the regulations were not violated. Mr. Kam's testimony would only have usurped NHTSA's decision that Chrysler had not violated the regulations. Because the evidence could confuse and mislead the jury, we find that the trial court did not abuse its discretion in excluding this evidence.

In the alternative, the Gibsons argue that Chrysler is judicially estopped from arguing that Mr. Kam could not offer expert opinion as to whether Chrysler should have conducted the recall earlier because the company has taken a contrary position before a Pennsylvania court in the prior litigation of *Crawley v. Daimler Chrysler Corp*., July 1990, No. 4900, slip op. (C.P.Phila.Mar. 5, 2001). In the Pennsylvania case, Chrysler offered former NHTSA engineer, William Boehly, to testify on its behalf regarding whether the air bags at issue in that case were defective.

Judicial estoppel is an equitable doctrine that is designed to prevent a party from "gaining an unfair advantage" by making inconsistent statements on the same issue in different lawsuits. *Marcus v. Marcus*, 993 S.W.2d 596, 602 (Tenn.1999) (quoting *Carvell v. Bottoms*, 900 S.W.2d 23, 30 (Tenn.1995)). Judicial estoppel arises when a person makes a sworn statement in a judicial proceeding and then contradicts the statement in a subsequent proceeding. *Decatur County Bank v. Duck*, 969 S.W .2d 393, 397 (Tenn. Ct. App.1997). However, while the law of judicial estoppel is ordinarily applied to one who has made oath to a state of facts in a former judicial proceeding which in a later proceeding he undertakes to contradict, yet it is frequently applied, where no oath

is involved, to one who undertakes to maintain inconsistent positions in a judicial proceeding. Stamper v. Venable, 97 S.W., 812 (Tenn. 1906).

In short, the Gibsons assert that Chrysler should not be allowed to use the testimony of a former NHTSA employee concerning whether a product is defective under the Federal Motor Safety Standards ("FMSVA") (i.e. Mr. Boehly) to their advantage in one trial and then have testimony from a former NHTSA employee concerning whether a recall was timely implemented within the meaning of the FMSVA (i.e. Mr. Kam) excluded for their benefit in another trial. We disagree. The *Crawley* case, and Mr. Boehly's testimony therein, differs from the case at bar and the proffered testimony of Mr. Kam. The *Crawley* case, unlike the one at bar, did not involve a recall. More importantly, however, Mr. Boehly was an engineer with NHTSA who was asked to give his engineering opinion on the issue of whether placement of airbag vents at the 9 and 3 positions constituted a defect. Although Mr. Kam was an attorney with NHTSA, as discussed *supra*, he had not been involved in NHTSA's investigation of the car seat prior to Chrysler's recall. Here, Chrysler is not seeking to exclude Mr. Kam's testimony merely because he is a former NHTSA employee, which position would, indeed, be contrary to their position taken in *Crawley*. Rather, Chrysler seeks to exclude Mr. Kam's testimony in that Mr. Kam is not qualified in knowledge or experience to give it and in that the question of whether a recall is timely is within the purview of NHTSA. Chrysler's position, concerning the testimonies of Messrs. Boehly and Kam, is not inconsistent. Consequently, we find that the Gibsons' judicial estoppel argument is without merit.

For the foregoing reasons, the Judgment on the jury verdict is affirmed. Costs of this appeal are assessed to the Appellants, Luke N. Gibson, Roger O. Gibson, Susan M. Gibson, and their surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.